**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 07a0683n.06
Filed: September 20, 2007

**No. 06-3501**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| Liberte Capital Group, LLC, et al.,; | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| Ursula Linke; Angelo Salcedo; Larry Thompson, | ) | |
| | ) | ON APPEAL FROM THE |
| Intervenors-Plaintiffs-Appellants, | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE |
| v. | ) | NORTHERN DISTRICT OF |
| | ) | OHIO |
| James A. Capwill, et al.,; | ) | |
| | ) | **O P I N I O N** |
| Defendants, | ) | |
| | ) | |
| William T. Wuliger, Receiver, | ) | |
| | ) | |
| Intervenor-Defendant-Appellee. | ) | |

**BEFORE:    BATCHELDER, CLAY, and McKEAGUE, Circuit Judges.**

**McKeague, Circuit Judge.** Investors lost substantial amounts of their monies due to the fact that the insurance policies underlying the viatical investments in which they had invested were procured through fraud. A receiver was appointed over the entity that served as escrow agent and fiduciary for companies that marketed the viatical settlements, Liberte and Alpha. Later, the receiver's authority was expanded such that "all claims against former agents and/or brokers of Alpha and Liberte for damages in contract or tort actions arising out of claims by investors are

deemed to be assets of the receivership estates and must be filed by the Receiver[], if at all." The investors sought a declaratory judgment that they, and not the receiver, had the right to pursue the arbitration claims they had filed against their broker-dealers alleging fraud and misrepresentation inducing their investments. On cross motions for summary judgment, the district court granted the receiver's motion, authorizing him to pursue the arbitration claims and declaring that if the investors continue to pursue the litigation, any proceeds will be added to the receivership estate and will be distributed *pro rata* to the entire class of investors harmed. For the reasons stated below, we REVERSE.

## I. BACKGROUND

In 1997, James A. Capwill and Viatical Escrow Services ("VES") agreed to serve as escrow agents for the handling of investment funds in Liberte Capital Group ("Liberte") and Alpha Capital Group ("Alpha") viatical settlements.[1] Liberte and Alpha marketed viatical life insurance policies to investors, using VES to provide trustee services in handling monies received from investors to buy polices and to service the payment of premiums. *Liberte Capital Group, LLC v. Capwill*, 462 F.3d 543, 547 (6th Cir. 2006). Liberte and Alpha purchased viatical insurance policies from insurance companies or brokerage firms, marketed the investments, and then contracted with agents to locate and resell the policies to investors. Capital Fund Leasing ("CFL") invested funds obtained by VES

---

[1] Viatical settlements allow investors to invest in another person's life insurance policy. The investor purchases the policy, or a part thereof, at a price less than the policy's death benefit. When the seller of the policy dies, the investor collects the death benefit. The investor's return is dependent upon the seller's life expectancy and the actual date the seller dies.

in the latter's function as escrow agent and fiduciary for companies that marketed viatical settlements. *Id.*

Many of the insurance policies underlying the viatical investments that Liberte and Alpha had marketed were procured through fraud. *Liberte Capital*, 462 F.3d at 547. For example, some of the viators misrepresented their health in order to obtain coverage. Additionally, Capwill and his escrow companies embezzled or absconded with the funds they held in escrow with which they were required to pay premiums to maintain the policies and pay out death benefits to investors upon the matched viator's death. Accordingly, in 1999, Liberte sued Capwill, VES, and CFL in federal district court, alleging, inter alia, that they misappropriated escrow funds. The district court appointed a receiver "to oversee and to administer the business and assets of VES and CFL . . . to take and maintain exclusive and complete custody, control and possession of all the assets belonging to VES and CFL."[2] In November 1999, the scope of the receivership was extended

> to cover all interests in any and all insurance policies funded by investors which Liberte Capital, LLC or Alpha Capital, LLC contacted, which are or were in the name of James A. Capwill, Capwill & Co., CWN Group or any other name, either as nominee owner or as trustee . . . for the purpose of managing and administering insurance policies in which one of the foregoing either is named as owner, beneficiary or Trustee, including, but is not limited to death claims, rescission issues, premium payment issues and anything else reasonably necessary in the management of these insurance policies.

Later, the scope of the receivership extended yet again to cover Capwill's assets.

---

[2] There have been three General Receivers in this case as well as one receiver for the intervening plaintiff Alpha. When Appellants first intervened, Victor Javitch was the General Receiver. Prior to the March 15, 2006 summary judgment order, the General Receivership duties were transferred to William T. Wuliger ("Appellee"), who is also the Alpha Receiver.

In December 2000, Ursula Linke and Angelo Salcedo, purchasers of Liberte viaticals, filed arbitration claims with the National Association of Securities Dealers, Inc. ("NASD") against Washington Square Securities, Inc. ("WSSI"), their broker-dealer, alleging that WSSI was liable for its representatives' fraudulently inducing them to purchase Liberte viaticals. On January 30, 2001, John Lazar, a Liberte investor who had intervened in the action, moved for class certification, and the district court granted the motion. The motion was granted in order to evaluate Liberte policies and to help oversee decisions concerning the sale or rescission of policies and the proper allocation of proceeds between Liberte and Alpha. On July 15, 2002, Linke and Salcedo filed a complaint against their broker-dealer, WSSI in federal district court. They sought a determination that the arbitration claims they had filed against WSSI before the NASD were not encompassed within the Liberte class action. In September 2002, Larry Thompson filed an arbitration claim against his broker-dealer, Carillon Investments, Inc. ("Carillon"), alleging that its representatives had fraudulently induced him to purchase Liberte investments. The receiver initially approved of these arbitration claims against WSSI and Carillon, and he stated that the arbitration proceedings did not interfere with his duties.

In 2002, however, the receiver began initiating suits to recover the lost investments and the return of commissions. On October 2, 2002, the district court stated in an order that it "is of the view that all claims against former agents and/or brokers of Alpha and Liberte for damages in contract or tort actions arising out of claims by investors are deemed to be assets of the receivership estates and must be filed by the Receivers, if at all." J.A. at 1162. Along these lines, on November 7, 2002, the receivership court adopted a *pro rata* method of disbursement for the Liberte class. We affirmed the

disbursement method in *Liberte Capital Group, LLC v. Capwill*, 148 F. App'x 426, 437 (6th Cir. 2005), but we did not discuss the import of the October 2, 2002 order.

On January 28, 2003, Thompson moved to intervene in the receivership proceedings, seeking a declaration that his arbitration claim belonged to him and that it was not a part of the receivership estate. On April 22, 2003, the receivers filed a motion for an additional statement of authority. Recognizing that the matter "has developed well beyond the original conception of the parties and the Court both in terms of its breadth and complexity," the district court ordered that the receivers "are empowered to represent and pursue the interests of investors directly in keeping with the ultimate goal of maximizing the Estates for their benefit." J.A. at 1610-11.

On June 26, 2003, the district court determined that the arbitration claims of Linke and Salcedo against WSSI were "distinct from the class claims" and granted Linke's and Salcedo's motion regarding arbitrability. J.A. at 1651. However, in so holding, the district court also referenced its October 2, 2002, and April 22, 2003, orders, stating that it had "modified the duties of the Receivers" and that "in addition to their general charge of marshaling assets on behalf of the receivership estates, the Receivers have and continue to file cases against, *inter alia*, brokerage houses, banks, and insurance agents." J.A. at 1649-50. We affirmed the arbitrability ruling in *Liberte Capital Group, LLC v. Capwill*, 148 F. App'x 413, 418 (6th Cir. 2005).[3]

---

[3] It is important to note that in that case, and in the litany of others we have heard arising out of these facts, we have left unaddressed the issue presented in this appeal, namely who has the right to pursue the arbitration claims. Indeed, we specifically stated,

[W]hether the General Receiver is entitled to bring Linke's and Salcedo's arbitration claim or recover the proceeds of such an arbitration is a separate issue from whether

On July 21, 2003, the district court granted Thompson's motion to intervene in the receivership proceedings. On July 23, 2003, Linke and Salcedo filed a second motion to intervene, claiming that they have a legal interest in their arbitration claim, that their ability to protect that interest after intervention is substantially impaired, and that their interest is inadequately represented by the parties already before the court. On June 9, 2004, the district court granted the motion.

On May 10, 2004, Thompson filed an intervention complaint against then-receiver Victor Javitch, seeking a determination that his arbitration claims against his broker-dealer and his broker belonged to him and not to the receiver. On June 10, 2004, Linke and Salcedo sued the receiver, requesting that the district court declare that they may bring their arbitration claim in their own names and are not required to deliver to the receiver any damages that may be awarded by the arbitrators. On July 21, 2004, the receiver filed answers and counterclaims to the complaints of Linke and Salcedo as well as Thompson (collectively "Appellants"). The receiver requested that the district court enter judgment against Appellants, and he sought a declaration that Appellants must bring their arbitration claims under his name, as the receiver, and that any proceeds recovered by them are assets of the receivership estate or that any recovered proceeds will be deducted from any

---

Linke's and Salcedo's claims are arbitrable in the first instance. The parties even concede that the issue of whether the General Receiver owns the claims of individual investors is "currently being litigated in the district court." Because only the district court's order of June 26, 2003, regarding the question of arbitrability was referenced in the notice of appeal, we have no jurisdiction to consider in this appeal the extent of the General Receiver's authority over the claims of individual viatical investors.

*Liberte Capital*, 148 F. App'x at 417 n.1.

entitlement they have as beneficiaries of the receivership estate. All parties moved for summary judgment on September 24, 2004.

On March 15, 2006, the district court granted summary judgment to the receiver and denied Appellants' summary judgment motion. The court first reasoned that Appellants' argument that their arbitration claims are distinct from the receiver's civil litigation against agents and brokers is not persuasive. Second, the court stated that Appellants' argument that the receiver lacks standing to bring the arbitration claims "is not well taken," mainly because in a case on which Appellants relied, *Javitch v. First Union Sec., Inc.*, 315 F.3d 619 (6th Cir. 2003), this Court "did not have the precise issue presented, and did not opine, contrary to [Appellants'] assertion, that [the receiver] could *not* advance a suit on behalf of the investors." J.A. at 2320.

Third, the district court considered equitable arguments. The judge noted that it is generally recognized that a receiver may bring suit to accomplish the objective of the suit for which his or her appointment was made, or under the specific directions of the appointing court, or pursuant to his general duties to receive, control, and manage the receivership property. The court concluded that allowing Appellants to pursue an independent action "would be an affront to the equitable principles currently in place to the detriment of all Liberte investors." J.A. at 2322. Fourth, the district court held that the receiver is not precluded from pursuing the claims based on the *in pari delicto* doctrine. Finally, the court stated that it was cognizant of the costs expended by Appellants thus far in litigation and that it was confident that the parties "can come to a mutually agreeable resolution" that would allow Appellants to continue to pursue the litigation, "provided the proceeds of the

undertaking are added to the Receivership estate and not do violence to the *pro rata* ruling currently in place." J.A. at 2325.

Appellants filed a timely appeal, contending, inter alia, that Appellee lacks standing to pursue the arbitration claims, that the district court decision violates the Takings Clause of the Fifth Amendment, that Appellee is attempting to cause Appellants to "lose the same money twice," and that the equitable doctrine of *in pari delicto* bars Appellee from asserting the arbitration claims.

## II. ANALYSIS

### A. Standard of Review

We generally review de novo a district court's decision to grant summary judgment. *See, e.g.*, *Lindsey v. Detroit Entm't, LLC*, 484 F.3d 824, 827 (6th Cir. 2007) (citations omitted). Yet Appellee argues that abuse of discretion review is applicable to the instant case, to the extent that this case concerns a district court's administration of the receivership, that the lower court considered a number of equitable issues, that we have noted that "[a] district court has broad powers and wide discretion in fashioning relief in an equity receivership proceeding," *Liberte Capital Group, LLC v. Capwill*, 421 F.3d 377, 382 (6th Cir. 2005), and that when a district court balances the equities, it "is overruled only in the rarest of cases," *Hadix v. Johnson*, 182 F.3d 400, 404 (6th Cir. 1999). The instant case provides no occasion for resolving this, as the district court erred under either standard of review.

Summary judgment is required "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ.

P. 56(c). The court deciding a motion for summary judgment must view the evidence and draw all reasonable inferences in favor of the non-moving party. *Lindsey*, 484 F.3d at 827 (citation omitted).

**B. The Authority to Pursue the Arbitration Claims**

**1. A District Court's Powers in Presiding Over an Equity Receivership**

We have recognized that although bankruptcy cases, in which Congress has set forth broad and detailed statutes to guide federal courts, comprise the vast majority of cases involving receiverships, there remains a class of cases in which federal courts may exercise their equitable powers, instituting receiverships over disputed assets in cases within the courts' jurisdiction. *Liberte Capital*, 462 F.3d at 551. We have emphasized that district courts enjoy broad equitable powers to appoint a receiver over disputed assets in litigation before them. *Id.*; *see also* 13 Moore's Federal Practice § 66.07[3] (3d ed. 2007) ("The appellate court is limited to determining whether the appointing court abused its discretion, either in the appointment of the receiver or in the administration of the receivership."). The role of the receiver is to safeguard disputed assets, to suitably administer the receivership property, and to assist the district court in achieving a final, equitable distribution of the assets. *Liberte Capital*, 462 F.3d at 551. The receiver's powers are coextensive with his order of appointment. *Id.* (citing 13 Moore's Federal Practice §§ 66.02-.03 (3d ed. 1999)).

**2. Standing**

The district court addressed standing, albeit in a perfunctory manner. It examined the issue in light of only one case, *Javitch*, and concluded that because "[t]he Sixth Circuit [in *Javitch*] did not have the precise issue presented and did not opine, contrary to [Appellants'] assertion that

[Appellee] could *not* advance a suit on behalf of the investors, . . . [Appellants'] position on this issue is not well taken." J.A. at 2320.

"The appointment of a receiver is inherently limited by the jurisdictional constraints of Article III and all other curbs on federal court jurisdiction." *Scholes v. Schroeder*, 744 F. Supp. 1419, 1421 (N.D. Ill. 1990). "Constitutional standing is always a 'threshold inquir[y] which this court is obligated to consider prior to asserting jurisdiction over [an] appeal.'" *Newsome v. Batavia Local Sch. Dist.*, 842 F.2d 920, 922 (6th Cir. 1988) (citation omitted).

> To satisfy the "case" or "controversy requirement" of Article III, which is the "irreducible constitutional minimum" of standing, a plaintiff must, generally speaking, demonstrate that he has suffered "injury in fact," that the injury is "fairly traceable" to the actions of the defendant, and that the injury will likely be redressed by a favorable decision.

*Bennett v. Spear*, 520 U.S. 154, 162 (1997) (citation omitted). "[A] party must have a 'personal stake in the outcome of the controversy' to satisfy Article III." *Stevenson v. J.C. Bradford & Co. (In re Cannon)*, 277 F.3d 838, 852 (6th Cir. 2002) (citation omitted).

Here, the Appellee cannot show that the receivership entities suffered an "injury in fact" that is "fairly traceable" to the actions of WSSI and Carillon. *See*, *e.g.*, *Goodman v. FCC*, 182 F.3d 987, 992 (D.C. Cir. 1999) ("We conclude that Goodman [the receiver] lacks standing to sue the Commission. He does not represent the parties who sustained the injury of which he complains, nor is there anything preventing the parties who were injured from themselves protecting their rights."). Nor can the Appellee show that the receivership entities have a "personal stake" in the outcome of the controversy involving WSSI and Carillon. The mere fact that the Appellee *would like* to pull the

arbitration proceeds into the receivership pool does not establish a "personal stake" for the receivership entities.

We have recognized the general rule that a receiver acquires no greater rights and powers to sue than the person or entity whose property is in receivership. *See Javitch*, 315 F.3d at 625 ("Because they stand in the shoes of the entity in receivership, receivers have been found to lack standing to bring suit unless the receivership entity could have brought the same action.") (citations omitted). Accordingly, when a receiver is appointed over a corporation, the receiver may only assert claims that could have been asserted by the corporation, and the receiver lacks standing to institute action on behalf of investors in the corporation. 13 Moore's Federal Practice § 66.08[1][b] (3d ed. 2005). Indeed, *Javitch* emphasized that "although the stated objective of a receivership may be to preserve the estate for the benefit of creditors, that does not equate to a grant of authority to pursue claims belonging to the creditors." 315 F.3d at 627 (citing *Jarrett v. Kassel*, 972 F.2d 1415, 1426 (6th Cir. 1992)).

A number of our cases and those from other jurisdictions apply these general rules to a context closely analogous to the instant action, compelling our conclusion that Appellee lacks standing to pursue Appellants' arbitration claims. In *Jarrett*, from April 1980 until December 1981, the plaintiffs purchased contracts for the future delivery of coal from an organization named National Coal Exchange ("NCE"). 972 F.2d at 1417. The plaintiffs alleged that NCE's owners and employees secured the sales by making misrepresentations and without having the means of

acquiring the coal necessary to fulfill contractual obligations. *Id.* In 1981, the Commodity Futures Trading Commission ("CFTC") filed suit against NCE, alleging violations of the Commodity Exchange Act. *Id.* The district court in that action appointed Erich Merrill as receiver for NCE and the other companies that were involved in the scheme. *Id.* at 1418. As receiver, Merrill sought and obtained permission from the federal district court in the CFTC litigation to file suit on behalf of NCE's customers. *Id.* In the suit, he claimed that the officers of NCE and another entity, inter alia, conspired to defraud NCE's customers in violation of Tennessee common law. *Id.*

We stated that Merrill "did not have general authority to take legal action on behalf of NCE's customers." *Jarrett*, 972 F.2d at 1426 (citation omitted). Noting that the plaintiffs (NCE's customers) correctly stated that as corporate receiver, Merrill was charged with the authority to protect their interests in the receivership property, we nevertheless emphasized that the plaintiffs erred in "equat[ing] this limited authority with general authority to represent their legal interests." *Id.* Accordingly, Merrill's authority as receiver "was limited to preserving the property of the NCE receivership for those customers. In this regard, he had authority to sue on behalf of the receivership itself *but had no authority to bring a cause of action on behalf of the individual customers*." *Id.* (emphasis added). This proposition is replete in federal appellate case law. *See, e.g.*, *Goodman v. F.C.C.*, 182 F.3d 987, 991 (D.C. Cir. 1999); *Troelstrup v. Index Futures Group, Inc.*, 130 F.3d 1274, 1277 (7th Cir. 1997); *Miller v. Harding*, No. 00-1245, 2000 WL 1792990, at *2 (1st Cir. Dec. 5, 2000). Thus, to the extent that Appellee serves as receiver for VES and CFL, he lacks authority to sue on behalf of investors such as Appellants, as VES and CFL had no standing to file suit for the

- 12 -

misrepresentation on the part of brokers and agents that induced the investment of Appellants and

other Liberte investors.

A further review of the applicable case law reinforces this conclusion, notwithstanding (1)

the fact that the receivership was later extended to cover the interests in policies funded by Liberte

investors[4] and (2) the district court's statements in its October 2, 2002 and April 22, 2003 orders that

---

[4] Moore's Federal Practice states that "when a receiver was appointed over a fund, the receiver was the proper party to bring suit against the brokers for the alleged solicitation of investors." 13 Moore's Federal Practice § 66.08[1][b] (3d ed. 2005) (citing *Commodity Futures Trading Comm'n v. Chilcott Portfolio Mgmt.*, 713 F.2d 1477 (10th Cir. 1983)).

In *Chilcott*, Thomas Chilcott had operated a Ponzi scheme, attracting nearly $80 million in investments for a commodities pool from around 400 people. 713 F.2d at 1480. A federal district court appointed James Johnson as equity receiver "to take custody and control of all assets and records, to prevent further dissipation of assets, and to prosecute or defend all actions which he, with the court's approval, might deem necessary to protect or recover assets of Chilcott." *Id.* With the district court's approval, Johnson brought "a separate, ancillary" action against Chilcott and others who "allegedly dealt with Chilcott in soliciting investors and investing assets of the pool." *Id.* The same day, Johnson filed a motion in the underlying suit by the CFTC against Chilcott, seeking an order staying all other suits against the defendants in Johnson's action. *Id.* The district court granted the stay. *Id.* The suits stayed by the order included claims by investors "based on the role of the intermediary brokers and their employees in the operation of Chilcott's allegedly fraudulent scheme and generally allege that the investors were induced to invest with Chilcott through misrepresentations." *Id.* at 1481.

In reversing the district court, the Tenth Circuit noted that the district court was correct in holding that Johnson had the capacity to initiate the action for "soliciting" investors. *Chilcott*, 713 F.2d at 1482. However, the Tenth Circuit expressly stated that it was not addressing the issue of standing. *Id.* at 1482-83. Furthermore, that court held that the district court abused its discretion in staying the investors' actions. *Id.* at 1487. Importantly, the court noted that "the fact that the Receiver is asserting *only claims of the pool* means that the *investors will eventually have to proceed with their individual actions if they are to recover at all on their claims of misrepresentations in the inducement to invest* and for damages resulting therefrom." *Id.* at 1485 (emphasis added).

Accordingly, while upon a first reading of the Moore's Federal Practice statement quoted above one may possibly conclude that it lends support to Appellee's position in the instant case, a thorough reading of the case used to support that quote indicates that the fact that the receivership estate was extended to cover the interests in policies funded by Liberte investors, if anything, further undermines Appellee's position. Indeed, when the standing issue arose later in the course of the

(a) it "is of the view that all claims against former agents and/or brokers of Alpha and Liberte for damages in contract or tort actions arising out of claims by investors are deemed to be assets of the receivership estates and must be filed by the Receivers, if at all," J.A. at 1162, and (b) "in addition to their general charge of marshaling assets on behalf of the receivership estates, the Receivers have and continue to file cases against, *inter alia*, brokerage houses, banks, and insurance agents," J.A. at 1649-50.

Our decision in *Jarrett*, in addition to the authority outside this Circuit cited below, undermines the second argument. In *Jarrett*, we held that notwithstanding the fact that the receiver sought and obtained permission from the receivership court to file suit on behalf of NCE's customers in which the receiver claimed that the officers of NCE and another entity, inter alia, conspired to defraud NCE's customers in violation of Tennessee common law, *Jarrett*, 972 F.2d at 1418, the receiver had authority to sue on behalf of the receivership itself, but he had no authority to bring a cause of action on behalf of the individual customers, *id.* at 1426.

In *Scholes v. Schroeder*, 744 F. Supp. 1419, 1420-23 (N.D. Ill. 1990), Steven Scholes, appointed as receiver of D&S Trading Group, Ltd., Analytic Trading Systems, Inc., and Analytic Trading Service, Inc., attempted to raise claims "framed in terms of alleged fraud on the investors." The court reiterated the principle cited above, stating that "[f]raud on *investors* that damages those *investors* is for those *investors* to pursue-not the receiver. By contrast, fraud on the *receivership*

_____

Chilcott litigation, the district court held that Johnson lacked standing to assert claims under the Commodity Exchange Act and the Securities Exchange Act because the deception and misrepresentations harmed defrauded investors, not the fund, which was actually the beneficiary of that deception. *Johnson v. Chilcott*, 590 F. Supp. 204, 208-10 (D. Colo. 1984).

*entity* that operates to *its* damage is for the *receiver* to pursue." *Id.* at 1422. The court further emphasized that a district court's authority with respect to appointing a receiver is limited by Article III and other constraints on federal court jurisdiction. *Id.* at 1421. Accordingly, just as the receivership court could not authorize the receiver to bring suits on behalf of entities wholly unrelated to the suit, neither could the receivership court authorize the receiver to pursue claims belonging to investors rather than to the entities in receivership. *Id.* More succinctly, the court held that to the extent that the orders appointing the receiver purported to confer power on him to sue directly on behalf of investors, those orders exceeded the judiciary's power and would not be enforced. *Id.* at 1423.

The conclusion that the district court exceeded its appointment authority in the instant case finds support in still other federal precedent. In *Marwil v. Farah*, No. 1:03-CV-0482-DFH, 2003 WL 23095657, at *7 (S.D. Ind. Dec. 11, 2003), the plaintiff, Jeff Marwil, was appointed receiver for Church Extension of the Church of God, Inc. ("CEG") and United Management Services, Inc. ("UMS"). *Id.* at *1. CEG sold over $85 million in investment notes while representing that the funds from the notes would be used primarily for interest-bearing loans to local churches. *Id.* at *2. A subsequent investigation by the SEC revealed that the funds were actually misappropriated and were used to pay prior investors. *Id.* at *3. The SEC filed a securities action against CEG, UMS, and their respective presidents, Peter Grubbs and Louis Jackson. *Id.* The district court appointed Marwil as a receiver for CEG, ordering him "to ensure that the Investors are made whole with respect to the funds they invested with [CEG]." *Id.* at *3-4.

Marwil filed suit against Barry Farah, alleging, inter alia, equitable disgorgement on the grounds that the latter negligently misrepresented the value of assets sold to CEG. *Marwil*, 2003 WL 23095657, at *3-4. The court held that Marwil, as receiver, lacked standing to represent the investors directly. *Id.* at *1. The court reasoned that notwithstanding the language of the receivership court order that enabled him "to assert Causes of Action on behalf of Noteholders" and ordered him "to ensure that the Investors are made whole with respect to the funds they invested with [CEG]," *id.* at *3, *5, the court lacked the authority to transfer property–including causes of action–from the investors to the receiver, *id.* at *5. The court emphasized that to hold otherwise would extend a district court's jurisdiction beyond the confines of Article III. *See id.* at *5-6.

A number of other cases stand for *Scholes*' proposition that fraud on investors that damages those investors is for the investors, and not the receiver, to pursue, whereas fraud on the receivership entity that operates to its damage is for the receiver to pursue, 744 F. Supp. at 1422, notwithstanding a district court's language granting a receiver authority beyond Article III restrictions. *See Fleming v. Lind-Waldock & Co.*, 922 F.2d 20, 24-25 (1st Cir. 1990) (holding that although the district court empowered the receiver "to prevent irreparable loss, damage and injury to commodity customers and clients," the receiver lacked standing to sue for claims belonging to investors, such as violations of the Commodity Exchange Act); *B.E.L.T., Inc. v. Lacrad Intern. Corp.*, No. 01 C 4296, 2002 WL 1905389, at *1-2 (N.D. Ill. Aug. 19, 2002) (holding that the receiver for a corporation had no standing to sue for, inter alia, receipt of funds fraudulently obtained, fraud, and unjust enrichment even though he was appointed "on behalf of all the creditors," because those were claims of the creditors, not of the corporation); *Scholes v. Tomlinson*, Nos. 90 C 1350/6615/7201, 89 C 8407, 1991

WL 152062, at *2 (N.D. Ill. July 29, 1991) (modifying the order appointing the receiver such as "to omit any other language in the order which purports to confer authority upon the Receiver to institute actions belonging to the investors, clients, or account holders of the receivership entities" in light of the rule set forth in *Scholes*). Applying those principles to the instant case, Appellee's reliance on the district court orders of October 2, 2002 and April 22, 2003 to further his contention that he has the right to pursue the arbitration claims in question, is misplaced. Case law demonstrates that the district court exceeded its authority in so ordering.

The dissent erroneously claims that "case law clearly indicates that receivers have broad powers to pursue claims on behalf of a receivership estate and individual investors, and that the scope of a receiver's power is determined by the district court's appointment orders." Dis. Op. at 5. The dissent apparently believes that the scope of a receiver's power is solely determined by the district court, no matter how broad the particular grant. The error in such a conclusion has been sufficiently detailed above and in *Scholes*, 744 F. Supp. at 1421. Yet we pause here to emphasize that the dissent arrives at such a mistaken conclusion only by misstating and misinterpreting our precedent and that of our sister circuits.

The dissent arrives at its conclusion that *Chilcott* "plainly supports an affirmance of the district court's decision" only by misreading that case. Dis. Op. at 11. Indeed, the dissent makes such a claim notwithstanding the *Chilcott* Court's express statement that "[w]e do not, however, reach or decide the standing question."[5] 713 F.2d at 1483. *Chilcott* actually constitutes strong

_____

[5] The *Chilcott* Court declined to reach the standing issue because it was not decided by the district court. 713 F.2d at 1483. Consequently, to the extent that the district court addressed the

persuasive authority for our decision today, as the Tenth Circuit explicitly recognized the difference between the investors' pre-purchase claims of fraudulent inducement to invest and the receiver's post-purchase claims of dissipation of the commodities pool's assets, and emphasized, in concluding that the receiver could raise the latter, that the receiver could not raise the former:[6] "the fact that the Receiver is asserting *only claims of the pool* means that the *investors will eventually have to proceed with their individual actions if they are to recover at all on their claims of misrepresentations in the inducement to invest* and for damages resulting therefrom." *Id.* at 1481, 1485 (emphasis added). Furthermore, on remand, the district court so concluded, holding that the receiver lacked standing to assert the claims of deception and misrepresentation that harmed defrauded investors. *Chilcott*, 590 F. Supp. at 208-10. While apparently noting the pre- and post-purchase distinction made in *Chilcott*, *see* Dis. Op. at 10, the dissent nevertheless fails to recognize that same distinction or its import in the instant case; our opinion, on the other hand, is consistent with the Tenth Circuit's statements in *Chilcott*, and it underscores the legal significance of that distinction.

---

standing issue in the instant case, there is no merit to the dissent's implicit conclusion that we should not address the issue. *See* Dis. Op. at 11.

[6] The dissent mischaracterizes the holding in *Chilcott*, claiming that "the Court expressly held that 'the Receiver had the capacity to bring the Receiver's action and was the proper real party in interest to bring [a] suit' on behalf of individual investors." Dis. Op. at 11 (quoting *Chilcott*, 713 F.2d at 1483). In reality, the *Chilcott* Court stated only that the receiver "was the proper real party in interest to bring *that* suit," 713 F.2d at 1483 (emphasis added), namely the suit raising the post-purchase claims. *Id*. at 1481 ("the Receiver's action . . .is based on the dissipation of the pool's assets rather than on any culpable conduct in soliciting the investments"). Accordingly, an accurate account of the Tenth Circuit's statement reveals that it is entirely consistent with our holding today and that the dissent's modification of that statement is simply an attempt to recharacterize it such as to assign it force unintended by the Tenth Circuit.

The dissent misrepresents *Fleming v. Lind-Waldock & Co.*, 922 F.2d 20 (1st Cir. 1990), in claiming that case supports its conclusion. In *Fleming*, a district court order had denied standing to the receiver as representative of investors, stating that "It is axiomatic that [a receiver's] power is derived from and limited by the order of the court appointing him." *Id.* at 25. It was also the district court–not the First Circuit–that "noted that the language of the [appointment] order did not grant . . . representational power to [the receiver]." *See Fleming*, 922 F.2d at 25. The dissent apparently believes that simply because the First Circuit set forth the procedural history of the case in *Fleming*, it "implicitly adopted the district court's reasoning." Dis. Op. at 10. That is, the dissent attempts to attribute the district court's statements to the First Circuit, notwithstanding the fact that even a cursory review of the *Fleming* opinion reveals that the First Circuit never expressly or impliedly adopted, affirmed, or "not[ed] with approval," as the dissent claims, the district court's reasoning.[7] *See* 922 F.2d at 24-25. Instead, the First Circuit decided the case using the approach we employ today, citing many cases–including *Chilcott*–affirming "representation of the corporation and protection of *its* assets as the *only* purview of the receiver," and concluding that "[t]he funds allegedly mismanaged . . . belonged entirely to investors, not to [the entity in receivership]. Hence, Fleming as equity receiver cannot assert these investors' claims." *Id.* at 25 (emphasis added). *Fleming* is thus entirely consistent with our holding today.

---

[7] If one were to accept the dissent's approach, a federal appellate court would be deemed to have "implicitly adopted" the district court's reasoning whenever the appellate court discusses the district court's reasoning and then decides the case by employing an alternative approach. Such reasoning is clearly inconsistent with the proper interpretation of appellate precedent.

The dissent's reliance on *McGinness v. United States*, 90 F.3d 143 (6th Cir. 1996), is similarly void of any persuasive value. The dissent fails to appreciate the fact that the *McGinness* decision was founded expressly on Ohio law. Indeed, the receiver in that case was appointed by the Lake County, Ohio Court of Common Pleas, and this Court relied on Ohio case law and Ohio statutory law in holding that the receiver was not barred from bringing the wrongful levy suit. *See id.* at 145-46. Specifically, this Court explicitly relied on a section of the Ohio Revised Code in stating that "[t]he appointing court defines the powers of the receiver and, therefore, controls his actions." *Id.* at 145. Hoping to extend *McGinness* to the instant case, the dissent apparently would have us, a federal court, be bound by such Ohio state law even though neither of the parties in the instant case–nor the dissent for that matter–claims that an Ohio court appointed the receiver or that Ohio law otherwise controls. By stating in conclusory fashion that we do not "properly distinguish[]" *McGinness*, Dis. Op. at 9, the dissent chooses to ignore this critical distinguishing feature of that case and thereby refuses to address this anomaly.

The dissent's discussion of *Javitch* is also misleading and unpersuasive. For example, the dissent again attempts to attribute portions of *McGinness* to the *Javitch* Court, yet the *Javitch* decision simply describes what this Court held in *McGinness*, and it never adopted those statements as it own or otherwise affirmed them, as the dissent implies. *Compare Javitch*, 315 F.3d at 626, *with* Dis. Op. at 5-6. Additionally, the dissent selectively quotes *Javitch*, claiming that this Court "concluded that a receiver 'could stand in the shoes of the entity in receivership, depending on the authority granted by the appointing court and actually exercised by the receiver.'" Dis. Op. at 6 (internal brackets and ellipsis omitted). Again, however, the dissent also ignores the fact that *Javitch*

was simply describing *McGinness*. *See Javitch*, 315 F.3d at 626. Through this series of omissions and misstatements, the dissent attempts to give binding effect to *McGinness*; however, that case's paramount reliance on applicable Ohio state law, as stated above, demonstrates that it, of course, cannot be binding here and that the dissent errs in attempting to make such an extension.

Furthermore, although the dissent makes much of the claim of the district court in the instant case that nothing in *Javitch* stands for the proposition that a receiver may never be authorized to pursue claims on behalf of individual investors, it is worth noting that nothing in *Javitch* stands for the proposition that a receiver may *ever* be authorized to pursue claims on behalf of individual investors. The dissent apparently believes that simply because the question was not directly answered, it is permissible for it to assume the answer in the favor of the conclusion it today posits. That point aside, the district court's–and hence the dissent's–statement is actually incorrect, as it ignores the suggestive language in *Javitch* that is consistent with our holding today. *See id.* at 625, 627 (emphasizing that "although the stated objective of a receivership may be to preserve the estate for the benefit of creditors, that does not equate to a grant of authority to pursue claims belonging to the creditors").

Finally, the dissent fails to explain how or why it ignores the portions of *Jarrett* cited above. *See* 972 F.2d at 1417-18, 1426. The dissent merely notes that the receiver's actions in that case, for statute of limitations purposes, were attributable to the individual investors after the district court authorized the receiver to represent the investors. The dissent then claims that *Jarrett* supports its conclusion today. However, although the dissent would have us believe otherwise, this Court certainly never stated that a district court's granting the receiver permission to sue on behalf of

individual customers was proper; indeed, that was not at issue in *Jarrett*. The dissent's supposition is particularly anomalous in light of the *Jarrett* Court's recognition that the receiver's authority "was limited to preserving the property of the NCE receivership for those customers. In this regard, he had authority to sue on behalf of the receivership itself *but had no authority to bring a cause of action on behalf of the individual customers*." *Id.* at 1426 (emphasis added).

Consequently, a review of the cases cited by the dissent demonstrates that it reaches its conclusion that a receiver's powers–no matter how broad–are determined solely by the district court's appointment orders only by misrepresenting and misstating precedent. Its approach, constituting a vast departure from the extensive case law cited above, also fails to suggest any principled reason for such a departure.

Appellee asserts two remaining arguments in support of his contention that he has standing to pursue Appellants' arbitration claims: (1) VES had standing to pursue the claims as trustee over investor funds, and hence so does Appellee as successor-trustee, and (2) he has independent standing to pursue the claims by virtue of the district court's assignment of investor property. Each of these arguments fails.

First, Appellee claims that "VES functioned as a trustee over investor accounts, and as such, had independent standing to assert claims relating to the trust property." Appellee's Br. 27. He argues that VES and Appellants thus have concurrent standing to assert the arbitration claims. In support of this claim, he cites our precedent for the proposition that trustees have standing to maintain any action to remedy an injury with respect to trust property. Appellee's Br. 28 (quoting *In re Cannon*, 277 F.3d 838, 854 (6th Cir. 2002)). He contends that "[s]uch broad language denotes

a very loose conception of standing, permitting trustees to pursue any action that relates to property in trust." Appellee's Br. 28-29. He also attempts to distinguish the instant case from the cases set out above by virtue of the fact that in the former the investors have a direct interest in the property held by the receivership entities in trust, whereas in the latter investors had only a derivative interest in the receivership estate based on their equitable interest in the receivership entity itself. Accordingly, he concludes that VES, as trustee for investor funds, "had at least an equal right, and perhaps even a superior right to sue for tortious conduct resulting in the diminishment of trust property." Appellee's Br. 31.

For several reasons, this argument fails. First, and most importantly, it seems that Appellee misses the point entirely. Indeed, he claims that he has the right to sue for "tortious conduct *resulting in the diminishment of trust property*" and that "trustees have standing to maintain any action to remedy *an injury with respect to trust property*." Appellee's Br. 28, 31 (emphasis added). Yet the instant action does not concern tortious conduct that injures or diminishes property in trust. Rather, it concerns tortious conduct that induced the decision to place property in trust. Indeed, the claims arising from that tortious conduct never were trust property. This distinction was emphasized in *Knauer v. Jonathon Roberts Fin. Group, Inc.*, 348 F.3d 230 (7th Cir. 2003). In that case dealing with a Ponzi scheme, the Seventh Circuit stated,

> For our purposes, it is useful to think of Ponzi schemes as being comprised of two phases. First, the schemer solicits and receives money for investment, guaranteeing high returns while doing little with the money to produce actual profits. While in this first stage, the schemer may generate some income for himself by charging a fee or paying himself a salary with the funds, this "sales" step is not the source of most of his Ponzi gains. After all, the Ponzi schemer is not content to enrich himself

- 23 -

modestly by extracting fees or salaries from the funds he has solicited. Rather, the schemer realizes most of his gains by appropriating large sums of money from the solicited funds, the pace of the withdrawals accelerating as he is ready to disband the Ponzi entity and make off with its assets. This "embezzlement" step of the Ponzi scheme depletes the Ponzi entity of resources, which are diverted to the entity's principal, the schemer.

*Id.* at 233. Having made that distinction, the court concluded that "we believe the district court was probably correct in concluding that [the receiver] had no standing to pursue the Ponzi sales claims. . . . Any claim relating to the fraudulent sales rightfully belongs to the wronged investors." *Id.* at 234. *Knauer* thus makes explicit that while Appellee may be correct that he has right to sue for "tortious conduct resulting in the diminishment of trust property" and that "trustees have standing to maintain any action to remedy an injury with respect to trust property," those propositions do not vest him with authority to assert Appellants' arbitration claims in the instant case, as claims involving injury or diminishment of trust property are not the type of claim at issue here.[8]

Along the same lines, Appellee relies heavily on *Cannon*, claiming that in that case we "reasoned that an escrow agent has standing to pursue causes of action on behalf of third party trust beneficiaries." Appellee's Br. 32-33 (citing *Cannon*, 277 F.3d at 853-54). However, in the cited

---

[8] The dissent fails to appreciate this logical distinction, instead choosing to make much of its contention that Appellee "has successfully brought both 'pre-purchase' and 'post-purchase' claims on behalf of investors in the past." Dis. Op. at 2. However, to the extent that the three cases it cites have all been dismissed, one is left to wonder how the dissent arrived at its characterization of those claims as "successful[]." Indeed, there is actually evidence as to just the opposite, as Appellants claim that Appellee "has not generally sued broker-dealers on the ground that they are liable because their registered representatives recommended Liberte investments to their clients." Appellants' Br. 9. The dissent's other contention fails entirely to address the pre- and post-purchase distinction and instead assumes the result, claiming that Appellee has the authority to raise the arbitration claims simply because he has filed suit alleging harm under similar theories.

pages, we merely noted that "[u]nder the common law, a trustee can maintain an action in law or equity against a third person to remedy an injury *with respect to trust property* as if he held the property free of the trust; generally, beneficiaries of the trust cannot." *Cannon*, 277 F.3d at 854 (emphasis added). He then argues that *Cannon* stands for the proposition that "but for the fact that the successor trustee [] had succeeded to his position via bankruptcy law, he would have had standing to pursue the beneficiaries' claims directly." Appellee's Br. 34.

This argument suffers from the same defect as that discussed immediately above, as Appellee assumes the result by equating injuries to trust property with injuries to investors in the form of fraudulently inducing them to place their property in trust in the first instance. Another court has already rejected Appellee's conclusion, stating that it is "extraordinarily troubling to find [the receiver's] counsel invoking authorities from the bankruptcy area as though they stated any different principle [than the one that the receiver cannot bring causes of action that belong to their investors, as contrasted with claims that belong directly to the companies for whom the receiver is the appointed representative]." *Scholes*, 744 F. Supp. at 1421-22.

Finally, it should be noted that Appellee is similarly unconvincing in his attempt to distinguish the cases cited above on the grounds that they involve investors having only a derivative interest in the receivership estate, based on the investors' equitable interest in the receivership entity itself, whereas the instant case involves investors having a direct interest in the property held by the receivership entities in trust. Indeed, he cites no reason as to why such a distinguishing feature is of any importance. Rather, he merely concludes that "[b]ecause of this unique twist, the interests

of the Receiver in this case as successor-trustee are synonymous with those of investors." Appellee's Br. 30. Furthermore, he even concedes that the distinguishing feature is present "in many (if not all)" of the cases cited by Appellants. Accordingly, if Appellee can explain neither why his purported distinguishing fact is relevant nor whether all of the cases cited by Appellant are even distinguishable on that ground, we see no reason to depart from the aforementioned overwhelming precedent.

Appellee's second general argument appears to consist of two subparts: (1) the November 9, 1999 order "operated as an assignment," such that the receivership estate includes the actual investments, thereby rendering Appellee the successor-in-interest with respect to those investors, and hence any injury to the investors' property is an injury-in-fact to Appellee; and (2) the October 2, 2002 and April 22, 2003 orders also "operate as assignments," assigning all choses in action relating to the investors' viatical settlements to Appellee, by virtue of Appellee's contention that "an assignment operates to confer individual creditors' standing on a receiver, curing any standing deficiency based on lack of injury-in-fact and enabling him to pursue the creditors' claims directly," Appellee's Br. 38 (citing *DeNune v. Consol. Campbell Investors v. TPSS Acquisition Corp.*, 288 F. Supp. 2d 844, 848 (N.D. Ohio 2003)).

It should be noted that, in connection with this argument, Appellee cites no authority, save for his usual argument in which he concludes that equity receivers can lawfully perform any number of acts simply because although those acts are forbidden by the bankruptcy code, the instant case is not governed by the bankruptcy code. For these reasons, we reject the first subpart of Appellee's argument.

Appellee's second claim also fails. Although he relies on *DeNune*, that case concerned a lawful, agreed-upon assignment. 288 F. Supp. 2d at 848. As Appellants point out, they neither agreed to nor received consideration in connection with any assignment of their arbitration claims. Thus, Appellee's characterization of the district court's orders of October 2, 2002 and April 22, 2003 as assignments of the arbitration claims is entirely unsupported by the record, and any reliance on *DeNune* is misplaced.

Furthermore, as stated above, overwhelming authority exists for the proposition that Appellee lacks the authority to pursue Appellants' arbitration claims even if the district court has declared that he has such right. *See, e.g.*, *Scholes*, 744 F. Supp. at 1421-22; *Marwil*, 2003 WL 23095657, at *5; *see also Jarrett*, 972 F.2d at 1418, 1426. Indeed, if Appellee's position were correct and a district court could confer individual creditors' standing on a receiver simply by ordering it so, such an exception would completely swallow the general rule that receivers may only sue on behalf of the entity they are appointed to represent, not on behalf of creditors and investors directly. Appellee has established no basis for such a vast expansion of a receiver's authority or a departure from this overwhelming case law.

Finally, in discussing equitable considerations, the district court stated that the receivership court's directives "are generally aimed at marshaling assets for the benefit of the class/investors." J.A. at 2321. It also noted that tracing or matching of investors to policies was not possible, and it therefore concluded that "the result of allowing [Appellants] to pursue an independent action [] would be an affront to the equitable principles currently in place to the detriment of all the Liberte investors." J.A. at 2322. Ostensibly, the district court feared that allowing Appellants to assert their

pre-purchase claims could adversely affect Appellee's post-purchase claims, disrupting the *pro rata* scheme set in place by the district court in such a way that "[i]ndividual recoveries could result in a windfall for some investors at the expense of their fellow investors or class members." J.A. at 1642-43.

Our precedent compels the conclusion that the district court erred in so holding. In *Jarrett*, we held that the receiver did not have general authority to take legal action on behalf of the customers/investors of the entity in receivership simply because the receiver had authority to take charge of the entity's property in order to protect the interests of the customers/investors. 972 F.2d at 1426. Furthermore, in an earlier proceeding in the instant case, we noted, in determining the propriety of the receiver's seizure of certain assets, that "[a]lthough equity and justice are appropriate considerations for distribution, they skirt the legal basis for [the investor's] claim that [the assets] never should have been made a part of the receivership estate." *Liberte Capital*, 421 F.3d at 384. *See also Chilcott*, 590 F. Supp. at 208-09 (rejecting a different "attenuated 'but for' causation argument to sidestep the failed logic of relying on misrepresentations to investors as the basis for recovering on behalf of an entity"). Furthermore, we have uncovered no case in which a court held, or even suggested, that equitable considerations could trump a district court's exceeding its Article III powers by permitting a receiver to raise claims of investors. Neither does Appellee point us to any such authority.

In light of the overwhelming authority that not only states that Appellee has no right to pursue Appellants' arbitration claims but also refutes the arguments that Appellee attempts to make in seeking affirmance of the district court's holding, we are "firmly convinced that a mistake has

been made," *Whittington*, 455 F.3d at 738, and that the district court improperly applied the law,

*Barnes*, 401 F.3d at 741.[9]  The district court operated outside of Article III, granting excessive

authority to Appellee in the name of equity.  This was error, regardless of whether the standard of

review is de novo or abuse of discretion.

### III.  CONCLUSION

For the foregoing reasons, we REVERSE the decision of the district court.[10]

---

[9] Appellee's contention that any error here is harmless is simply incorrect.  Indeed, whether Appellants are permitted to pursue their arbitration claims and retain the proceeds of those claims, rather than simply share *pro rata* in the proceeds of those claims if Appellee actively pursues them–which Appellants allege he has in fact not done–results in the conclusion that the district court's error was surely not harmless.

[10] Because we so hold on the standing issue, we do not reach Appellants' remaining arguments.  Furthermore, our decision renders moot the Appellee's motion to strike portions of the Appellant's brief and motion to strike supplemental authority.

**CLAY, Circuit Judge, dissenting.** The majority finds that the district court erred in granting Appellee ("the Receiver") authorization to pursue the arbitration claims. I find that the majority's conclusion contravenes established case law that recognizes a district court's broad equitable powers to define the scope of a receiver's authority. Since there is simply no legal basis for usurping and encroaching upon the district court's broad equitable powers in this case, I would affirm the district court's decision.

## DISCUSSION

### I. Standard of Review

As an initial matter, the majority's fails to set forth the correct standard of review. The record clearly shows that the district court granted summary judgment in favor of the Receiver. The majority appears to argue that the district court's decision should be reviewed for abuse of discretion because the district court's "ultimate decision was founded on equitable concerns." (Appellee's Br. at 21) This standard of review is unsupported by case law. *See, e.g.*, *Carter v. RMH Teleservices, Inc.*, 205 F. App'x 214, 218 n.4 (5th Cir. 2006) (unpublished case) (holding that "[plaintiff] incorrectly concludes that an abuse of discretion is the standard of review for summary judgment."). Since this Court reviews a district court's summary judgment decision *de novo*, I will employ this standard in reviewing the claims raised in this case. *Old Life Ins. Co. of Am. v. Garcia*, 411 F.3d 605, 610 (6th Cir. 2005); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986); *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984).

### II. The Arbitration Claims

Appellants allege violations of securities laws, fraud, breach of fiduciary duty, breach of

contract, and negligence against the brokerage firms on the grounds that the broker-dealers sold

Liberte investments to them through misrepresentations and by failing to disclose material facts and

circumstances. Appellants seek actual damages and rescission, the benefit of the bargain,

consideration paid for the securities, lost opportunity costs, model portfolio damages, prejudgment

interest, and an award of attorneys' fees, costs, and punitive damages.

The majority finds that the arbitration claims are not encompassed by the receivership estate.

Essentially, the majority adopts Appellants' argument – namely, that the Receiver cannot bring the

arbitration claims because they are "pre-purchase" claims of fraud and wrongful inducement and that

the Receiver can only assert "post-purchase" claims such as the disgorgement of wrongfully

disbursed commissions. Although it may be possible to distinguish between "pre-purchase" and

"post-purchase" claims, this distinction is simply not meaningful or persuasive. First, the record

shows that the Receiver in this case has successfully brought both "pre-purchase" and "post-

purchase" claims on behalf of investors in the past. *See, e.g.*, *Wuliger v. Moore*, No. 03 CV 0734

(N.D. Ohio); *Javitch v. Gibson*, No. 04 CV 0262 (N.D. Ohio); *Wulinger v. Wash. Viatical Settlement*

*Brokers*, No. 04 CV 1526 (N.D. Ohio). As the district court aptly noted, the Receiver in this case

has pursued claims for

> (1) securities violations under both Securities Act of 1933 and
> Securities Exchange Act of 1934 with the prayer seeking an award of
> consideration paid by those [ ] investors whose business the
> Defendant solicited . . .
> (2) Racketeering Influenced and Corrupt Organizations ("RICO")
> seeking an award of treble damages of the amount of investment;
> (3) common law fraud seeking an award of damages consisting of the

> [ ] investors' lost investment . . .
> (4) fraud in the inducement seeking "an award of damages consisting
> of the [ ] investors lost investments . . . and
> (5) breach of contract seeking an award of damages consisting of the
> [ ] investors lost investments . . . .

(J.A. 2317) (internal quotation marks and citation omitted) (formatting added). A distinction between "pre-purchase" and "post-purchase" claims is also not practical because Appellants and the Receiver "seek liability under the same securities laws, both allege breach of contract, common law fraud and claims sounding in negligence." (J.A. 2318) The arbitration claims are simply not special or distinct, and the Receiver has clearly demonstrated the ability to pursue claims on behalf of investors. Second, in this case, the Receiver has an order from the district court authorizing him to pursue all claims on behalf of the receivership estate and the individual investors.

## III. The Receiver is Authorized to Pursue the Arbitration Claims[11]

Appellants' principal argument is that the district court "gave the Receiver greater rights to the [ ] arbitration claims than the Liberte receivership entity had," and that receivers "can sue only

---

[11] Appellants advance nine arguments in support of the proposition that the arbitration claims belong to them: 1) the Receiver is attempting to cause Appellants to lose the same money twice; 2) receivers do not have the power to bring suit directly on behalf of investors in receivership entities; 3) giving the arbitration claims to the Receiver would violate the Takings Clause of the Fifth Amendment; 4) receivers cannot lawfully take claims belonging to investors in a receivership entity; 5) the district court incorrectly interpreted *McGinness v. United States*, 90 F.3d 143, 144-45 (6th Cir. 1996); 6) the issue in this appeal is whether the arbitration claims belong to the receivership estate, not whether the *pro rata* method of distributing funds from the receivership estate is correct; 7) the Receiver does not have authority to pursue pre-purchase claims against Liberte agents for wrongfully inducing investors to invest; 8) the *in pari delicto* doctrine precludes the Receiver from taking the arbitration claims; and, finally, 9) Appellants are capable of pursuing the arbitration claims without the Receiver's assistance. Even though all of these claims were thoroughly briefed and discussed by the parties, the majority opinion primarily addresses the standing claim, presumably because the other claims do not support a reversal of the district court's decision or are otherwise meritless.

on behalf of the entities for whom they are appointed and cannot sue on behalf of investors in those entities." (Appellants' Br. at 16)  Appellants cite a plethora of cases in support of this argument. However, most of the cases are inapposite because they concern bankruptcy receivers.  A bankruptcy receiver's duties and functions are different from those of an equity receiver, particularly because the scope of a bankruptcy receiver's power is set forth in statutes.  *See, e.g.*, *In re Cannon*, 277 F.3d 838, 848 (6th Cir. 2002) (noting that a bankruptcy statute grants a bankruptcy trustee the standing and power to avoid the transfer of an interest in property); *see also In re Van Dresser Corp.*, 128 F.3d 945, 947 (6th Cir. 1997) (construing the scope of a bankruptcy estate under the relevant bankruptcy statutes).

The Receiver has standing to pursue claims against the brokerage firms because he has been expressly authorized by the district court to bring claims on behalf of the receivership estate and defrauded investors.  The Receiver is assigned the rights of the parties he is representing.  *See, e.g.*, *Goodman v. FCC*, 182 F.3d 987, 991-92 (D.C. Cir. 1999) (holding that a receiver may lack standing to sue if the party he is representing cannot allege an injury or assert a claim).  While this representation is often limited to the entity held in receivership, this Court's precedents allow a district court to extend that representation to parties alleging claims against that entity.  *Javitch v. First Union Sec., Inc.*, 315 F.3d 619, 626 (6th Cir. 2003).  In this case, the district court did just that. Furthermore, the record contains concrete and particularized allegations of fraud.  Since the alleged injuries are fairly traceable to the action of the broker-dealers, there is a causal connection between the challenged conduct and the alleged injuries.  Moreover, it is also likely that the injuries will be redressed by a favorable decision.  Simply put, the parties the Receiver has been authorized to

represent have standing to sue the broker-dealers. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). Since the Receiver is authorized to represent the defrauded investors, he may assert claims against the broker-dealers. *See Javitch*, 315 F.3d at 626. Therefore, this case is not, as the majority suggests, one where the receiver hopes to "pull the arbitration proceeds into the receivership pool" without a sufficient stake in the outcome of that arbitration. Maj. Op. at 10. Rather, this is a case where the district court has properly authorized the receiver to protect the rights of the receivership estate and the defrauded investors alike.

Contrary to the majority's conclusion, case law clearly indicates that receivers have broad powers to pursue claims on behalf of a receivership estate and individual investors, and that the scope of a receiver's power is determined by the district court's appointment orders. *See, e.g.*, *Javitch*, 315 F.3d at 625-27; *McGinness v. United States*, 90 F.3d 143, 145 (6th Cir. 1996); *Jarrett v. Kassel*, 972 F.2d 1415, 1426 (6th Cir. 1992).

In *Javitch*, a receiver sued four brokerage firms for negligence, breach of fiduciary duties and various securities violations on behalf of defrauded individual investors. 315 F.3d at 622. The receiver claimed that he could bring the action on behalf of the individual investors, but the brokerage firms moved to dismiss the action. On appeal, this Court stated:

> Ohio courts have described a receiver as "merely the administrative arm of the court who takes charge of the assets of the partnership for the purpose of conserving them to the ends of equity and *for the benefit of creditors* generally." *Tonti v. Tonti,* 118 N.E.2d 200, 202 (Ohio Ct. App.1951) (emphasis added); *see Mine Safety Appliances Co. v. Best,* 76 N.E.2d 108, 110 (Ohio Ct. Common Pleas 1947) (stating that the receiver "stands as a ministerial officer of the court not having title to the property, but obtaining his authority by the act

- 34 -

of the court alone"). The appointing court defines the powers of the
receiver and, therefore, controls his actions.

*Javitch*, 315 F.3d at 626 (quoting *McGinness*, 90 F.3d at 145-46) (emphasis in original). The Court

concluded that a receiver could "stand[ ] in the shoes of the entity in receivership, . . . depend[ing]

on the authority granted by the appointing court and actually exercised by the receiver," but found

that the receiver in *Javitch* did not have express authorization from the district court to pursue the

contested claims on behalf of individual investors. *Id.* As the district court correctly noted in this

case, nothing in *Javitch* stands for the proposition that a receiver may never be authorized to pursue

claims on behalf of individual investors. Rather, *Javitch* indicates that the district court determines

the scope of a receiver's powers. Since the district court did not authorize the receiver in *Javitch* to

pursue certain claims on behalf of investors, this Court properly found that pursuing the claims was

beyond the scope of the receiver's power in *Javitch*.

Similarly, this Court found that determining the scope of the receiver's appointment was

important in *Jarrett*, 972 F.2d at 1426. In *Jarrett*, a case where defendants "conspired with others

to sell contracts . . . in violation of the Commodity Exchange Act, 7 U.S.C. § 6," *id.* at 1417, the

district court appointed a receiver for "the [ ] companies involved in the [financial] scheme," *id.* at

1418. The receiver "acquired the assets of the companies for liquidation and distribution to the

defrauded customers but failed to collect sufficient funds for that purpose." *Id.* To procure

additional funds, the receiver "sought and obtained permission from the [district] court . . . to file

[a] lawsuit . . . on behalf of [the individual] customers against . . . one of the other companies

involved in the scheme." *Id.* Because the statute of limitations had elapsed, the receiver's action

was dismissed. On appeal, the individual investors argued that the statute of limitations should be tolled because the receiver's actions are attributable to the investors. This Court found "that the actions taken by [the receiver] before he filed th[e] suit . . . are not attributable to the plaintiffs," but that the "investigation [that] continued after [the suit was filed], is attributable to the plaintiffs, and tolled the running of the statute of limitations." *Id.* at 1426. More specifically, the Court stated:

> we first address the plaintiffs' argument that [the receiver's] actions as corporate receiver for [the company] were taken on their behalf. They base this argument on the receiver's authority to take charge of all of [the company's] property to protect the interests of [the] customers. Plaintiffs are correct that as corporate receiver, [the receiver] was charged with the authority to protect their interests in the specific property of the receivership. They err, however, when they equate this limited authority with general authority to represent their legal interests. As corporate receiver, [the receiver] did not have general authority to take legal action on behalf of [the] customers. His authority was limited to preserving the property of the [company's] receivership for those customers. In this regard, he had authority to sue on behalf of the receivership itself but had no authority to bring a cause of action on behalf of the individual customers.

*Id*. (citations omitted). In *Jarrett*, the receiver's actions were deemed to be attributable to the individual investors only after the district court authorized the receiver to represent the investors. Before the district court expanded the receiver's powers to encompass the lawsuit on behalf of the investors, the receiver simply could not represent or act on behalf of individual investors.

This Court reached a similar conclusion in *McGinness*, a case where an Ohio state court "appointed [a] receiver to take possession of property . . . for the purpose of satisfying a judgment rendered in a divorce action." 90 F.3d at 144-45. In *McGinness*, the receiver commenced a wrongful levy action against the Internal Revenue Service ("IRS"). The IRS moved to dismiss the receiver's

complaint arguing that the receiver "possessed no interest in or lien on the receivership property; and

[ ] [that] he stood in the place of the taxpayer." *Id.* at 145. As in *Javitch*, this Court stated that

> [t]he appointing court defines the powers of the receiver and, therefore, controls his actions . . . . Because the receiver does not act under the control of or on behalf of the debtor-taxpayer, he does not stand in the place of the owner of the assets over which he exercises his authority.

*Id.* at 145-46. The Court found that

> [w]hile . . . the receiver can acquire no greater legal rights or powers with respect to the property . . ., the receiver's powers are not limited to the legal rights of the debtor-taxpayer. Upon his appointment, the receiver succeeded to the rights of not only the debtor, but also the creditor. He assumed the power to enforce the rights which the creditors, but for the proceedings under which the receiver was appointed, might have enforced in their own behalf.

*Id.* at 146 (internal quotation marks and citations omitted). The Court concluded that the receiver

"was exercising th[e] power that the appointing court granted him; he was not exercising the rights

of [the debtor], representing [the debtor's] interests, or acting in [the debtor's] place." *Id.* The Court

rejected the government's argument that "the receiver's right to possess property is purely custodial

on behalf of the appointing court," and concluded that "the receiver in equity acquires lien creditor

status over those assets specified by the court at the time of appointment." *Id.* (citation omitted).

"As a lien creditor, [the receiver] has a property interest in the property he holds in his capacity as

receiver." *Id. McGinness* does not support a reversal of the district court's decision.

Contrary to the majority's averments, *McGinness* cannot be distinguished on the grounds that

it involved a receiver appointed under Ohio state law. This Court interpreted and applied *McGinness*

in *Javitch* and found that "*McGinness* does not stand for the proposition that a receiver never stands

in the shoes of the entity in receivership, but suggests that the question depends on the authority

granted by the appointing court and actually exercised by the receiver." *Javitch*, 315 F.3d at 626

(properly applying and interpreting *McGinness*) (citations omitted). Rather than properly

distinguishing *McGinness*, the majority attempts to distinguish *McGinness* by circumscribing the

application and interpretation of clearly established case law.[12] This Court's ruling in *McGinness*,

like *Javitch* and *Jarrett*, indicates that a receiver may litigate claims on behalf of a receivership estate

or individual investors provided that the receiver has the proper statutory or district court

authorization. This interpretation of *Javitch*, *Jarrett* and *McGinness* is supported by case law from

the First Circuit and Tenth Circuit. *See Fleming v. Lind-Waldock & Co.*, 922 F.2d 20, 24 (1st Cir.

1990); *see also Commodity Futures Trading Comm'n v. Chilcott Portfolio Mgmt.*, 713 F.2d 1477,

1482 (10th Cir. 1983).

In *Fleming*, a commodities fraud case, the district court appointed a receiver who

> was empowered: to take into his immediate custody, control and
> possession all assets and property belonging to, or in the possession
> of, [the investment company] . . . to prosecute all claims, choses in
> action and suits in equity on behalf of [the investment company] and
> to appear and take necessary or appropriate action in any suit,
> proceeding or negotiations . . . in order to represent and protect the
> interests of the equity receivership . . . to seek and to act subject to
> further order of the Court in order to prevent irreparable loss, damage
> and injury to commodity customers and clients and to conserve and
> prevent the dissipation of funds.

---

[12] Instead of confining itself to discussing the merits of the legal and factual issues presented by this case, the majority resorts to attacking the dissent by inappropriately alleging that it misrepresents applicable case law.

922 F.2d at 24 (formatting added) (citation omitted). The receiver in *Fleming* "insisted that the [ ] allusion to 'commodity customers and clients' [in district court's appointment] expressly or impliedly authorized him to assert actions on behalf of [the investment company's] investors." *Id.* The district court indicated that "[i]t is axiomatic that [a receiver's] power is derived from and limited by the order of the court appointing him," *id.* at 25 (internal quotation marks and citation omitted), but found that "the order appointing the . . . receiver does not authorize him to prosecute actions on behalf of individual investors," *id.* at 24 (citation omitted). The First Circuit affirmed the district court's decision.

Admittedly, the First Circuit stated that "representation of the corporation and protection of its assets as the only purview of the receiver," and found that the "equity receiver cannot assert these investors' claims." *Id*. at 25. However, in reaching this decision the Court emphasized the importance of the receiver's appointment order by specifically stating that the "[district] judge who had written that [appointment] order subsequently denied [the receiver's] later request for such authority" and noting with approval the district court's finding that "the language of the [appointment] order did not grant . . . representational power to [the receiver]." *Id.* Since the First Circuit offers the district court's reasoning in support of its conclusion, the Court implicitly adopted the district court's reasoning. This implicit adoption clearly illustrates how the First Circuit's conclusion was informed by the district court's interpretation of its appointment order. Contrary to the majority's position, it is simply not possible to divorce the outcome in *Fleming* from the language and scope of the receiver's appointment order. Like the cases discussed above, *Fleming*

indicates that the language of an appointment order is dispositive in determining the scope of the receiver's authorization from the district court.

In *Chilcott*, a case where a receiver "assert[ed] on behalf of the [receivership estate] substantive rights existing under Federal Law, the Securities Exchange Act, 15 U.S.C. § 78a *et seq,* and the Commodities Exchange Act, 7 U.S.C. § 1 *et seq.*," individual investors opposed a receiver's lawsuit arguing that "the Receiver had no standing to assert what they say are third-party claims." 713 F.2d at 1482. Contrary to the majority's view, *Chilcott* does not constitute strong persuasive authority for the majority's decision. Rather, *Chilcott* plainly supports an affirmance of the district court's decision in this case.

In *Chilcott*, individual investors brought "actions [ ] based on the role of the intermediary brokers and their employees in the operation of [an] allegedly fraudulent scheme and generally allege[d] that the investors were induced to invest . . . through misrepresentations." *Id.* at 1481. "In contrast, the Receiver's action, although naming some of the same defendants, [was] based on the dissipation of the [commodities] pool's assets rather than on any culpable conduct in soliciting the investments." *Id.* Since "Receiver [wa]s asserting *only* claims of the pool," the Court noted that "the investors will eventually have to proceed with their individual actions if they are to recover at all on their claims of misrepresentations in the inducement to invest and for damages resulting therefrom." *Id.* at 1485 (emphasis in original). However, the Court expressly held that "the Receiver had the capacity to initiate the Receiver's action and was the proper real party in interest to bring [a] suit" on behalf of individual investors. *Id.* at 1482. The Tenth Circuit declined to address standing and left the issue for the district court to decide. Notably, the Tenth Circuit stated that standing may be

decided based on "evidence produced" by the parties to "support the capacity to sue and the real party in interest." *Id.* at 1483. As in the cases discussed above, nothing in *Chilcott* indicates that there is an inherent limitation in a receiver's capacity to sue.

Instead of relying on *Chilcott*, the majority places great weight on the district court's decision on remand. The majority's reliance on the district court's ruling is misplaced because *Chilcott*—and not the district court decision—sets forth persuasive Tenth Circuit precedent. As stated above, the Tenth Circuit contemplated a case-by-case approach and instructed the district court to decide the issue of standing based on "evidence produced" by the parties. *Chilcott*, 713 F.2d at 1483. Since the outcome on remand was based on the evidence adduced by the parties, the district court's standing determination is fact-specific and simply does not control the outcome in the instant case.

The majority's reliance on *Knauer v. Jonathon Roberts Fin. Group, Inc.*, 348 F.3d 230, 234 (7th Cir. 2003), *Scholes v. Schroeder*, 744 F. Supp. 1419, 1420-23 (N.D. Ill. 1990), and *Marwil v. Farah*, No. 03-CV-0482-DFH, 2003 WL 23095657, at *5 (S.D. Ind. Dec. 11, 2003) (unpublished case) is woefully misplaced.

In *Knauer*, the Seventh Circuit summarily concluded "that the district court *was probably correct* in concluding that [a receiver] . . . had no standing to pursue the Ponzi sales claims" because the "Ponzi entities themselves are not injured by the sales of securities," but found that "the diversion of funds . . . did arguably constitute injuries to the Ponzi entities, giving [the receiver] standing to pursue" the claims of "embezzlement or taking of the funds." 348 F.3d at 234 (emphasis added). Although the Seventh Circuit's position appears to support the majority's position, the Seventh Circuit did not cite any case law or otherwise explain the basis for its conclusion. Since *Knauer* does

not set forth any support for its conclusion, it is difficult to see how its holding is persuasive. The decision must be significantly discounted.

Similarly, *Scholes* contains a dearth of legal reasoning. In *Scholes*, the district court found that it could not allow a receiver to "bring[ ] causes of action that belong to [the] investors," and held that "[t]o the extent that the orders tendered to [the court] . . . purport to authorize suit on behalf of the investors, those orders are at odds with the fundamental command of Article III." 744 F. Supp. at 1421. However, the court did not cite meaningful case law in support of this conclusion. Notably, the court relied on *Caplin v. Marine Midland Grace Trust Co. of New York*, 406 U.S. 416 (1972), a bankruptcy case where the Supreme Court found that a bankruptcy trustee does not have standing to sue an indenture trustee on behalf of debenture holders "by examining the nature of Chapter X [bankruptcy] proceedings, the role of the trustee in [bankruptcy] reorganization, and the way in which standing to sue on behalf of debenture holders would affect or change that role." *Id.* at 422. Since bankruptcy cases are factually and legally distinguishable from cases concerning equity receiverships, reliance on *Caplin* is not appropriate. *See, e.g.*, *Chilcott*, 713 F.2d at 1482 (finding that "*Caplin* is distinguishable" because "[i]t dealt with the right of a trustee under Chapter X of the Bankruptcy Act to assert, on behalf of debenture holders, claims of misconduct by an indenture trustee.").

Last, in *Marwil*, the district court found that "[n]otwithstanding the phrase included in an agreed court order negotiated among counsel in the SEC action, the court simply does not have the power to transfer property (including causes of action) from non-parties (the note holders) to the conservator/receiver." 2003 WL 23095657 at *5. *Marwil* – aside from being a non-binding,

unpublished district court case from a different jurisdiction – is simply not persuasive because it relies on cases concerning bankruptcy trustees. Like *Scholes*, *Marwil* improperly relied on *Caplin*. The majority's reliance on these cases is misplaced.

In this case, the majority misconstrues the cases discussed above and concludes that the Receiver simply cannot litigate claims on behalf of the individual investors. Where the courts have ruled against receivers, including *Jarrett*, *Javitch*, and *Fleming*, the rulings were compelled by receivers' attempts to exercise powers that were not included in their appointment orders. These cases show that receivers can only exercise the power that a district court gives them, and that receivers who fail to confine or otherwise limit themselves to the district court's appointment orders will not be allowed to exercise unrestrained power. Receivers may only exercise powers that were contemplated by the district court and expressly set forth in the district court's appointment order.

Moreover, there is no language in any of these cases to support the conclusion that a receiver's powers are inherently limited. Case law does not support the proposition that receivers are never allowed to pursue claims on behalf of individual investors. Rather, this Court is charged with construing and interpreting the scope of the district court's appointment orders. Since "the question depends on the authority granted by the appointing court," a receiver enjoys the powers which the district court grants. *Javitch*, 315 F.3d at 626. Because receivers are given different powers by different courts, it is important to recognize that appointment orders must be interpreted on a case-by-case basis. The majority fails to recognize that a court's interpretation of an appointment order in another case does not control the outcome in this case because the scope of a receiver's duties and responsibilities varies. *See* J.A. 2320 (noting that "the orders modifying the

Receivers' authority to the present are a stark contrast to the original orders of appointment *and signify the strange odyssey of this particular litigation.*") (emphasis added).

In the instant case, the record clearly shows that the district court granted broad powers to the Receiver. The district court's appointment orders "are generally aimed at marshaling assets for the benefit of the class/investors, among others." (J.A. 2320-21) (footnote omitted). In this case, the district court authorized the Receiver to take control of Liberte policies to maximize their worth in the best interest of the investors. The Receiver is "authorized to commence litigation against banks who participated in illegal activities of money laundering, RICO violations, negligence, and other tortious conduct which contributed to the depletion of funds from [Capwill's entities]." (J.A. 2321) (internal quotation marks and citation omitted). The district court allowed the Receiver to recover commissions from Liberte agents and brokers. "Since the claims against agents and/or brokers sounding in contract or tort arose from claims by investors, those claims were 'deemed to be assets of the receivership estates' and were only to be pursued by the Receiver[ ]." *Id.* (citation omitted). The district court also "expanded the Receivers' responsibilities and authorized them 'to represent and pursue the interests of the investors directly.'" *Id.* (citation omitted). These are expansive appointment orders.

The district court also interpreted its appointment orders and concluded that the Receiver was authorized to bring claims on behalf of individual investors. The district court's decision is supported by the plain language of the appointment orders. The majority fails to give effect to language in appointment orders that empowers the Receiver to bring actions on behalf of individual

investors.[13]  In so doing, the majority has contravened established case law that recognizes a district court's broad equitable powers to define the scope of a receiver's authority.  Case law clearly indicates that courts look at the district court's appointment order to determine the scope of authority, and that a receiver cannot exercise powers beyond those awarded by the district court.  The majority deviates from established precedent by holding that the Receiver may not exercise powers expressly authorized by the district court.  In this case, there is simply no legal basis for usurping and encroaching upon the district court's broad equitable powers.

**IV.    Authorizing the Receiver to Pursue the Arbitration Claims is Not Unjust**

**1.    Reimbursement**

Appellants argue that they are entitled to retain the benefits of the arbitration claims because they have funded the arbitration claims for more than five years without the Receiver's assistance. The record shows that the district court was "cognizant of the costs expended thus far by the [Appellants] in pursuit of their arbitration claims."  (J.A. 2325)  Indeed, "[t]he Receiver [was] directed to initiate discussions regarding the issue of reimbursement with the [Appellants]."  (J.A. 2326)  No inequity would result from allowing the Receiver to recover any proceeds from the arbitration claims because the Receiver could reimburse Appellants for any costs already incurred. Appellants simply fail to explain in legal or practical terms why reimbursement is inadequate to compensate them for the expenses and costs they have incurred in the arbitration.

---

[13] As members of the underlying class action and active participants in this case, Appellants were in a position to oppose the Receiver's motions for additional authority to represent individual investors.  Appellants consistently failed to object to the district court's appointment orders.

## 2.    Dissatisfaction with the Receiver

Last, Appellants argue that the Receiver has sued few brokerage firms and is "settling claims

against Liberte agents for return of commissions, not full compensatory damages." (Appellants' Br.

at 45)  Appellants point to the Receiver's representations to the district court:

| | |
|---|---|
| Mr. Newcomber: | Investors may have other claims other than just the loss of their money . . . . |
| Mr. Javitch: | That's exactly the point because we're [pursuing] only the recovery of the commission. |
| Mr. Wuliger: | No, no.  [ ] [W]e are pursuing more than that, but for purposes of resolution . . . . we have uniformly taken the position, return the commission dollars. |
| The Court: | Well, that's right . . . . If someone returns the commission dollars, the case as against the receiver or receivers is done. |
| Mr. Javitch: | Right. |
| The Court: | Now, that does not insulate them from any claims of the individual investors, but I don't think we can handle that here . . . because . . . the claims may be wider than those encompassed in the class action. |

(J.A. 2081-82) (formatting added).  Appellants oppose the Receiver's settlement of claims against

brokerage firms for only the return of wrongfully paid commissions.  Essentially, Appellants appear

to complain about the Receiver's litigation or settlement strategy.  Appellants do not cite any case

law to support the proposition that dissatisfaction with a receiver's litigation strategy allows class

members to pursue independent relief.  Settlement inherently involves compromise and is designed

to limit exposure to liability, risk and uncertainty.  Contrary to the majority's averments, there is

nothing in the record to support a finding that the Receiver's settlement with brokerage firms on

behalf of individual investors in other cases has been unfair, unreasonable, inadequate or otherwise wrongful.

The majority's reversal of the district court's decision will result in substantial and significant harm to lower-income investors who lack the resources and capacity to pursue claims against brokerage firms own their own. By reversing the district court's decision, the majority is precluding the Receiver from holding brokerage firms accountable for their wrongdoing on behalf of all other members of the class action. In this case, the Receiver is "charged . . . with representing the interests of the investors when necessary, or when it would be impracticable or impossible for them to do so on their own." (J.A. 1633-34) The Receiver plays an important role in advocating on behalf of a large class of defrauded investors and should be allowed to represent lower-income investors because not all investors have Appellants' resources and capacity to arbitrate claims against brokerage firms. Indeed, the record shows that the Receiver has successfully brought claims against brokerage firms on behalf of individual investors without any objection from members of the class. The class members have benefitted from the Receiver's actions. The individual investors have already suffered a great financial harm, the majority's holding will exacerbate and compound this financial harm by precluding the Receiver from continuing to represent all other members of this large and complex class action. The majority's holding is not just legally incorrect, but greatly prejudicial and inequitable.

## CONCLUSION

For the foregoing reasons, I would affirm the district court's summary judgment decision.