*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 06a0340p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

LIBERTE CAPITAL GROUP, LLC, et al.,

*Plaintiffs,*

*v.*

No. 05-3510

JAMES A. CAPWILL, et al.,

*Defendants,*

SOUTHWESTERN LIFE INSURANCE COMPANY;
REASSURE AMERICA LIFE INSURANCE COMPANY;
VALLEY FORGE LIFE INSURANCE COMPANY,

*Appellants,*

VICTOR M. JAVITCH, acting Receiver,

*Appellee.*

---

Appeal from the United States District Court
for the Northern District of Ohio at Akron.
No. 99-00818—David A. Katz, District Judge.

Argued: March 17, 2006

Decided and Filed: September 5, 2006

Before: BATCHELDER, CLAY, and McKEAGUE, Circuit Judges.

---

### COUNSEL

**ARGUED:** John H. Korns, BUCHANAN INGERSOLL P.C., Washington, D.C., for Appellants.
William T. Wuliger, WULIGER, FADEL & BEYER, Cleveland, Ohio, for Appellee. **ON BRIEF:**
John H. Korns, BUCHANAN INGERSOLL P.C., Washington, D.C., for Appellants. William T.
Wuliger, WULIGER, FADEL & BEYER, Cleveland, Ohio, for Appellee.

---

### OPINION

---

CLAY, Circuit Judge. Appellants Southwestern Life Insurance Co., Reassure America Life
Insurance Co., and Valley Forge Life Insurance Co. (collectively, the "Insurers") appeal the April 6,
2005 order of the United States District Court for the Northern District of Ohio, finding the Insurers

1

in contempt of court for violations of previously issued injunctions in the court's Receivership case over the assets of former viatical settlement companies and their trustees. For the following reasons, we **AFFIRM** the district court's order.

## I.

## BACKGROUND

### A.    Substantive Facts

This case has a long and complicated history. The current dispute arises between three providers of life insurance policies, Southwestern Life Insurance Co., Reassure America Life Insurance Co., and Valley Forge Life Insurance Co. (collectively, the "Insurers"), and the court-appointed Receiver for two viatical settlement companies, Liberte Capital Group ("Liberte") and Alpha Capital Group ("Alpha"). The Insurers are not parties to the underlying litigation.

Both Liberte and Alpha marketed viatical life insurance policies to investors, and both used Viatical Escrow Services ("VES") to provide trustee services in handling monies received from investors to buy policies and to service premium payments over time. Capwill Fund Leasing ("CFL") invested monies obtained by VES in VES's capacity as escrow agent and fiduciary for companies engaged in marketing viatical settlements. VES and CFL were both wholly owned by James A. Capwill. In 1999, Liberte sued James Capwill, VES, and CFL in federal district court, alleging widespread civil RICO violations for the misuse, misappropriation, and dissipation of monies received from investors. A receiver was appointed in the Liberte case for the Liberte funds still held by VES and CFL. When Alpha joined the action as an intervening plaintiff, the district court likewise appointed a receiver over the Alpha funds and Alpha itself. Eventually, the two receiverships were joined under a single Receiver, William Wuliger, the Appellee in the case at bar.

The district court orders which appointed the Liberte and Alpha receivers established identical general injunctions against satellite litigation. The injunctions read:

> It is further ORDERED that all creditors, claimants, bodies politic, parties in interest, and all sheriffs, marshals, and other officers, and their respective attorneys, servants, agents, and employees, and all other persons, firms, and corporations be, and they hereby are, jointly and severally, enjoined and stayed from commencing or continuing any action at law or suit or proceeding in equity to foreclose any lien or enforce any claim against VES and/or CFL [and Alpha Capital Group], or their property, or against the Receiver in any court. Said entities are further stayed from executing or issuing or causing the execution or issuance out of any Court of any writ, process, summons, attachment, subpoena, replevin, execution, or other process for the purpose of impounding or taking possession of or interfering with, or enforcing any claim or lien upon, any property owned by or in the possession of the said Receiver, and from doing any act or thing whatsoever to interfere with the Receiver in the discharge of his duties in this proceeding with the exclusive jurisdiction of this Court over said properties and said Receiver.

(J.A. at 277-78, 454.)

Many of the insurance policies underlying the viatical investments marketed by Liberte and Alpha had been procured through fraud. A parallel government criminal investigation into James Capwill (the VES and CFL principal) estimated at one point that 56 percent of the insurance policies implicated in the Liberte viatical investments had been fraudulently obtained. The Insurers have pursued numerous independent actions to rescind or cancel fraudulently obtained policies. These

fraudulent policies were the subject of one of the Insurer's, Southwestern Life's, attempts to intervene in a related case (the "*Jamieson*" case) and the case at bar.[1]  Southwestern Life requested leave to intervene when the Liberte receiver at the time sought permission from the court to market insurance policies in the Liberte portfolio that had been designated by the government as fraudulently obtained but were beyond the contestability period.  Southwestern Life objected, arguing that to permit the receiver to sell the policies would be to perpetuate a fraud on the issuing insurance companies such as Southwestern Life.  In denying the motion, the district court required the receiver to market such policies only with full disclosure to prospective buyers as to potential claims against policy payment.  The district court also noted:

> Initially, it should be made clear what this Court is *not* adjudicating at this time; it is *not* adjudicating the respective rights of any investor, the Receiver, any purchaser of policies from the Receiver, or any insurer regarding any policy, in particular those policies sought to be marketed as to which the Government asserts a defense of fraud on the insurance company may be asserted to avoid payment.  Those issues as to specified policies may be the subject of future litigation in this or other courts of competent jurisdiction.
> . . . .
> The issue before this Court is the right of the Receiver to market and sell policies asserted to have been fraudulently obtained to sophisticated investors who are given appropriate warning of the defenses which may be asserted by the insurers . . . . This order does not deprive the insurers of any defenses available against the Receiver or any transferee of the Receiver.

(J.A. at 448-49, Order, April 13, 2001 (emphasis in original).)  The district court reiterated the applicability of the above order to the case at bar when the district court denied Southwestern Life's motion to intervene in its April 19, 2004 order in the Alpha receivership case:

> Turning to the purpose for which intervention is sought, Southwestern asserts it is 'solely on the issues concerning Southwestern Life Insurance policies' and the General Receiver's 'attempt[] to sell void and canceled policies.' . . . . However, this Court's Order of April 13, 2001 addressed these concerns . . . .
> . . . .
> As Southwestern is not precluded from otherwise bringing actions or asserting defenses relative to its policies, its purpose in this litigation does not strike this Court as necessary.

(J.A. at 549-59 Order, April 19, 2004.)  Both sides in the action before this Court agree that the above orders permit the Insurers to file declaratory judgment actions against the Receiver as the real party in interest for allegedly fraudulently obtained policies held in the Receivership portfolio.  The parties disagree, however, on *where* such actions may be filed, whether such actions may include matured policies already paid into the Receivership estate, and whether the above language permits joinder of Alpha and Liberte in actions.

---

[1]*United States v. Jamieson*, No. 3:00 CV 7312 (N.D. Ohio).  Both parties in the case at bar agree that the order in the *Jamieson* case was understood by all to apply to the case at bar as well, as further evidenced by the district court's later reference to the *Jamieson* order when denying Southwestern Life's subsequent motion to intervene in the instant case.

Liberte and Alpha are now defunct corporations, in existence solely for the purpose of distributing the remaining assets to the viatical investors under and pursuant to the Receivership in the case at bar.

## B.      Procedural History

### 1.      *The Delaware Lawsuit*

On January 13, 2005, the Insurers filed suit in Delaware Superior Court against Liberte, Alpha, and the Receiver. The complaint requested declaratory relief with respect to the Insurers' obligations on allegedly fraudulently obtained, but not yet matured, policies in the Receivership portfolio. In addition, the complaint requested damages and/or indemnification with respect to matured policies already paid out from the Liberte and Alpha investment pools (the funds for which are held in the Receivership) and which were allegedly procured through fraud. Finally, the Insurers requested a declaratory judgment that they were entitled to a set-off of their damages on fraudulent policies from their obligations to pay on legitimate policies in the Alpha and Liberte portfolios. For all counts the Insurers requested costs and attorneys' fees.

### 2.      *The Receiver's Motion for a Finding of Contempt*

After being served with the summons for the Delaware action, the Receiver filed a motion with the district court handling the Receivership case, requesting that the court hold that the Delaware action was in violation of the court's previously issued injunctions. In particular, the Receiver alleged that the Delaware state court was an improper forum for actions against the Receiver, that claims for money damages to be paid from Receivership assets were never authorized by the district court, that the joinder of Alpha as a defendant was in direct violation of district court orders, and that the request for set-off was a willful attempt to interfere with the Receiver's obligations to collect legitimate monies owed for distribution to investors.

### 3.      *The District Court's Conclusions*

After granting the Insurers an opportunity to show cause why the court should not find the Insurers in contempt of prior district court orders, the district court ruled that the Delaware litigation was in violation of its previously issued injunctions against satellite litigation because the suit exceeded the scope of the litigation exception carved out in the April 13, 2001 and April 19, 2004 orders. The district court concluded that the litigation exception was "limited . . . to suits 'against the Receiver or any transferee of the Receiver.'" (J.A. at 266 (citing the April 13, 2001 order).) In particular, the court held that it had never authorized suit against the entities in receivership, including Alpha Capital Group. The court also held that its authorization for suits against the Receiver or its transferees was limited to the validity of non-matured policies. The court found that its prior injunctions and orders in the case made it clear that the assets already held by the Receiver were not subject to contest. The court stated that it had "specifically held that any challenge to the validity of a life insurance policy within the Receivership portfolio must be raised prior to the viator's death, if at all." (J.A. at 267.) The court referenced the following language from the April 13, 2001 order:

> [T]he Receiver shall be permitted to accept death benefits on any mature policy, providing he has not received a prior notice of rescission or cancellation from any insurance company and that said policy has not been the subject of a prior order of any court of competent jurisdiction declaring such policy to be void due to fraud on the insurer.

(J.A. at 267.) Finally, the court found that:

in light of this Court's Order expressly enjoining the commencement of suit against receivership entity Alpha Capital Group (Doc. 1416), it appears that the insurers' sole purpose for joining Alpha as a defendant was to defeat the Receiver's diversity claim, force him to defend the action in a distant forum *non conveniens*, and unnecessarily increase the litigation costs to the Receivership estate, all to the detriment of the defrauded investors.

(J.A. at 268.)

In an order dated April 6, 2005, the district court found the Insurers in contempt of the court's general injunctions dated July 15, 1999 and February 13, 2002 because the Delaware suit was not within the April 13, 2001 and April 19, 2004 limited litigation exception. The district court enjoined the Insurers from pursuing the Delaware action and specifically noted that the insurers could file suit in a federal or state court in Ohio to litigate their financial obligations regarding any non-matured policies within the Receivership. The court held the issue of sanctions in abeyance.

### 4.        *The Insurers' Argument on Appeal*

The Insurers appealed the district court's order to this Court on April 19, 2005. The Insurers make three interrelated arguments to this Court. First, the Insurers argue that the district court's interpretation of its prior orders was "unfounded." In particular, the Insurers argue i) that the prior orders cannot be construed as limiting suits to nonmatured policies, ii) that the prior orders did not preclude the naming of Alpha as a defendant to the Insurers' tort claims, and iii) that the district court erred by finding that the Delaware court was not a court of "competent jurisdiction" in which the prior orders permitted suit. As a result, the Insurers argue, the district court abused its discretion in finding the Insurers in contempt of those prior orders. Second, the Insurers contend that district court's construction of the prior orders as permitting suit on policies only prior to a viator's death denied the Insurers' due process because the Insurers never had the opportunity to contest the order deciding as such. Finally, the Insurers argue in the alternative that, even were the district court's interpretation of the prior orders correct, the district court abused its discretion in enjoining the Delaware suit in its entirety in lieu of clarifying what could or could not be litigated in that forum.

## II.

## ANALYSIS

### A.        **Standard of Review**

This Court reviews a district court's finding of contempt for an abuse of discretion. *See Harrison v. Metro. Gov't of Nashville*, 80 F.3d 1107, 1112 (6th Cir. 1996). An abuse of discretion exists where the district court relied upon clearly erroneous findings of fact or applied an incorrect legal standard. *Id.* This Court will reverse only if it is left with a firm and definite conviction that a mistake has been made. *Id.*

The movant in a civil contempt proceeding bears the burden of proving by clear and convincing evidence that the respondent "violated a definite and specific order of the court requiring him to perform or refrain from performing a particular act or acts with knowledge of the court's order." *Glover v. Johnson*, 934 F.2d 703, 707 (6th Cir. 1991). This Court requires that the prior order be "clear and unambiguous" to support a finding of contempt. *Grace v. Ctr. for Auto Safety*, 72 F.3d 1236, 1241 (6th Cir. 1996). Ambiguities must be resolved in favor of the party charged with contempt. *Id.*

## B.    The Powers of a District Court Presiding Over an Equity Receivership

To begin, we review the powers of a federal district court presiding over an equity receivership.[2] Such receiverships are increasingly rare. The realm of bankruptcy encompasses the vast majority of cases involving receivership, and in that realm Congress has spoken by setting forth broad and detailed statutes to guide federal courts in the disposition of such cases. There remains a class of cases, however, in which the federal courts may exercise their equitable powers and institute receiverships over disputed assets in suits otherwise falling within the federal court's jurisdiction, but which fall outside the statutory bankruptcy proceedings or other legislated domain. In this range of cases the federal courts exercise the traditional, common law powers of equity. The current rules specifically reference such equitable practices and incorporate them into today's civil proceedings. Rule 66 of the Federal Rules of Civil Procedure instructs that: "The practice in the administration of estate by receivers or by other similar officers appointed by the court shall be in accordance with the practice heretofore followed in the courts of the United States or as provided in rules promulgated by the district courts." Fed. R. Civ. Pro. 66. Indeed, we have held in related proceedings to the instant case that "a district court has broad powers in fashioning relief in an equity receivership proceeding . . . ." *Liberte Capital Croup, LLC v. Capwill*, 421 F.3d 377, 382 (6th Cir. 2005).

A district court enjoys broad equitable powers to appoint a receiver over assets disputed in litigation before the court. The receiver's role, and the district court's purpose in the appointment, is to safeguard the disputed assets, administer the property as suitable, and to assist the district court in achieving a final, equitable distribution of the assets if necessary. *See* 13 *Moore's Federal Practice* ¶¶ 66.02-.03 (3d ed. 1999). As an officer of the court, the receiver's powers are coextensive with his order of appointment. *Id.*

Once assets are placed in receivership, a district court's equitable purpose demands that the court be able to exercise control over claims brought against those assets. The receivership court has a valid interest in both the value of the claims themselves and the costs of defending any suit as a drain on receivership assets. *See SEC v. Universal Fin.*, 760 F.2d 1034, 1038 (9th Cir. 1985). To this extent, the receivership court may issue a blanket injunction, staying litigation against the named receiver and the entities under his control unless leave of that court is first obtained. *See Barton v. Barbour*, 104 U.S. 126, 128 (1881) ("It is a general rule that before suit is brought against a receiver leave of the court by which he was appointed must be obtained.") This power extends to the institution of any suit, and not just a proceeding for execution of a judgment against the receivership in the receivership court. *Id.* at 129. ("We think, therefore, that it is immaterial whether the suit is brought against [the receiver] to recover specific property or to obtain judgment for a money demand. In either case leave should first be obtained.") Because the court's power of injunction in a receivership proceeding arises from its power over the assets in question, non-parties to the underlying litigation may be bound by a blanket stay, so long as the non-parties have notice of the injunction. *See Bien v. Robinson*, 208 U.S. 423, 427 (1908) (finding "frivolous" the contention that a non-party would not be bound by the court's injunction against claims against a receivership under the court's control); *see also SEC v. Wencke*, 622 F.2d 1363,1371 (9th Cir. 1980) (finding the district court's equitable powers over the property in receivership sufficient to justify a blanket stay against litigation without leave of the court, even against non-parties). Intentional interference with a receivership in contravention of a district court's blanket stay is punishable by contempt:

---

[2]"A receiver is an indifferent person between parties, appointed by the court to receive the rents, issue, or profits of land, or other thing in question, pending the suit, where it does not seem reasonable to the court that either party should do it." 1 *Clark on Receivers* § 11(a) (3d ed. 1959).

> No rule is better settled than that when a court has appointed a receiver, his possession is the possession of the court, for the benefit of the parties to the suit and all concerned, and cannot be disturbed without the leave of the court; and that if any person, without leave, intentionally interferes with such possession, he necessarily commits a contempt of court, and is liable to punishment therefor.

*In re Tyler*, 149 U.S. 164, 182 (1893).[3]

To the extent that a party has a colorable claim against a receiver or the entities in receivership, due process demands that the claimant be heard, but the district court exercises significant control over the time and manner of such proceedings. *See Liberte Capital Group*, 421 F.3d at 382; *see also SEC v. Am. Capital Invs., Inc.*, 98 F.3d 1133, 1146-47 (9th Cir. 1996). The district court may require all such claims to be brought before the receivership court for disposition pursuant to summary process consistent with the equity purpose of the court. *See SEC v. Mosburg*, 273 F.3d 657, 668 (6th Cir. 2001). The district court may also authorize, to the extent that the court deems appropriate, "satellite" litigation in forums outside of the receivership court to address ancillary issues. However, the receivership court typically retains jurisdiction over any attempt at execution of a judgment in such situations.

In addressing claims on the receivership estate brought before it, the district court may consider both the merits of the individual claim and the equities attendant to the situation. *See id.* The inability of a receivership estate to meet all of its obligations is typically the *sine qua non* of the receivership. In adjudicating claims on the receivership estate, or in making a decision to permit satellite litigation to resolve any claims, a district court may therefore consider such factors as litigation costs as a tax on the receivership estate, the ability of the parties to resolve their claims in the receivership court versus elsewhere, any culpability on the part of the claimant, and the implications for any satisfaction of an award on other claimants to the estate. *See id.*; *Universal Fin.*, 760 F.2d at 1037-38.

With these principles underling the district court's actions in this case, we now turn to the parties' arguments on appeal.

## C.     The Scope of the District Court's Prior Orders

### 1.     *The Blanket Stay*

At the onset of the receivership proceedings for both VES and Alpha, the district court entered blanket stays precluding suit against the Receiver or assets in the Receivership, absent explicit authorization by the Receivership court. The injunctions read:

> It is further ORDERED that all creditors, claimants, bodies politic, parties in interest, and all sheriffs, marshals, and other officers, and their respective attorneys, servants, agents, and employees, and all other persons, firms, and corporations be, and they hereby are, jointly and severally, enjoined and stayed from commencing or

---

[3]The well-grounded rule that the district court enjoys broad power to stay any and all suits against a receiver is buttressed by a existence of a statutory exception created by Congress in the late 1800s. The exception permits suit without leave of the court for torts committed against persons by the receiver when the receiver is engaged in the "carrying out of business" of the entity in receivership. The Supreme Court has construed this exception to apply only to injuries incurred from the entity in receivership's normal business operations, *e.g.*, an injury to a passenger on a train, when the receiver continues to operate the receivership entity in the normal course of business. *See* 28 U.S.C. § 959; *In re Tyler*, 149 U.S. at 182-83. The exception does not apply to claims which arose before the implementation of court control.

> continuing any action at law or suit or proceeding in equity to foreclose any lien or enforce any claim against VES and/or CFL [and Alpha Capital Group], or their property, or against the Receiver in any court. Said entities are further stayed from executing or issuing or causing the execution or issuance out of any Court of any writ, process, summons, attachment, subpoena, replevin, execution, or other process for the purpose of impounding or taking possession of or interfering with, or enforcing any claim or lien upon, any property owned by or in the possession of the said Receiver, and from doing any act or thing whatsoever to interfere with the Receiver in the discharge of his duties in this proceeding with the exclusive jurisdiction of this Court over said properties and said Receiver.

(J.A. at 277-78, 454.) The stay clearly enjoins "all . . . persons . . . from commencing or continuing any action at law or suit or proceeding in equity . . . to . . . enforce any claim against VES and/or CFL [and Alpha Capital Group], or their property, or against the Receiver in any court." (J.A. at 277-78, 454.)

The Insurers argue that this universal language is ambiguous with regard to its applicability to the Insurers because 1) the injunction does not specifically mention insurance companies, and 2) the injunction does not make it clear that the insurance companies could not bring suit to establish legal rights or claims, which could then only be enforced via application to the Receivership court. We find that both arguments are belied by the plain language of the injunction itself.

The stay is clearly written to encompass the broadest possible scope of potential action against the Receiver, the entities in Receivership, and Receivership assets. In fact, the stay contains the catch-all "any other persons" to include any person who happens not to be included by "creditors, claimants, bodies politic, parties in interest, and all sheriffs, marshals, and other officers, and their respective attorneys, servants, agents, and employees." The Insurers are clearly claimants, parties in interest, and "other persons." The Insurers' argument that the blanket stay does not unambiguously apply to them is disingenuous.

The Insurers' related argument that the stay does not clearly foreclose actions to "establish a legal claim" to be subsequently enforced only upon leave of the Receivership court similarly lacks merit. The stay is written in the broadest possible terms. The stay precludes suit "to . . . enforce any claim against VES and/or CFL [and Alpha Capital Group], or their property, or against the Receiver in any court." (J.A. at 277-78, 454.) A "claim" is defined simply as a "cause of action." *Black's Law Dictionary* 247 (6th ed. 1990). To argue that the adjudication of the legal rights of the Insurers against the Receiver with respect to the disputed policies is not "to enforce a claim" is unsupportable.

The blanket stay issued by the Receivership court was all-encompassing. The Insurers admit that they were on notice of this general injunction. Any suit brought by the Insurers must therefore have been specifically authorized by the "litigation exception" in the district courts' subsequent orders.

### 2. *The Litigation Exception*

The parties agree that the district court's memoranda and orders issued in response to Southwestern Life's motions to intervene established an exception to the previously issued injunctions. The relevant orders stated:

> Initially, it should be made clear what this Court is *not* adjudicating at this time; it is *not* adjudicating the respective rights of any investor, the Receiver, any purchaser

of policies from the Receiver, or any insurer regarding any policy, in particular those policies sought to be marketed as to which the Government asserts a defense of fraud on the insurance company may be asserted to avoid payment. Those issues as to specified policies may be the subject of future litigation in this or other courts of competent jurisdiction.

. . . .

The issue before this Court is the right of the Receiver to market and sell policies asserted to have been fraudulently obtained to sophisticated investors who are given appropriate warning of the defenses which may be asserted by the insurers . . . . This order does not deprive the insurers of any defenses available against the Receiver or any transferee of the Receiver.

. . . .

[T]he Receiver shall be permitted to accept death benefits on any mature policy, providing he has not received a prior notice of rescission or cancellation from any insurance company and that said policy has not been the subject of a prior order of any court of competent jurisdiction declaring such policy to be void due to fraud on the insurer.

(J.A. at 448-49, Order, April 13, 2001 (emphasis in original).) The district court reiterated the above order when the district court denied Southwestern Life's motion to intervene in the Alpha receivership case:

Turning to the purpose for which intervention is sought, Southwestern asserts it is 'solely on the issues concerning Southwestern Life Insurance policies' and the General Receiver's 'attempt[] to sell void and canceled policies' . . . . However, this Court's Order of April 13, 2001 addressed these concerns . . . .

. . . .

As Southwestern is not precluded from otherwise bringing actions or asserting defenses relative to its policies, its purpose in this litigation does not strike this Court as necessary.

(J.A. at 549-50.)

### a.     *The litigation exception does not authorize suit against Alpha*

To begin, the litigation exception as created by the above language does not authorize suits against Alpha. Because the prior general injunction specifically precluded suits against Alpha, court action was required to remove that part of the injunction. The above language only removes limitations on suits with respect to the Receiver. No mention is made of Alpha or the entities in Receivership. The Insurers argue that the language in the second order, "[a]s Southwestern is not precluded from otherwise bringing actions or asserting defenses relative to its policies," evidences a general permission for suit in relation to the policies against all relevant parties. (Pet'r Br. 24.) However, the 2004 order only reiterated the April 13, 2001 order, which specifically stated that "t]his order does not deprive the insurers of any defenses available against the *Receiver* or any transferee of the Receiver." (J.A. at 549-50 (emphasis added).) The 2004 order did not purport to create new rights of the parties with respect to the policies or permission to sue. Therefore, the litigation exception "clearly" and "unambiguously" permits suit only against the Receiver and never abrogated the prior injunction on suits against Alpha.

    b.      *The litigation exception does not authorize suits asserting claims to monies already held in the Receivership estate*

Because the general injunction clearly and unambiguously operated to preclude any and all suits against the Receiver, the claims in the Delaware litigation which requested damages to be paid from the Receivership estate must have been authorized by the April 13, 2001 order granting the litigation exception, if at all. We find that the April 13, 2001 litigation exception does not authorize suits for claims against money assets held in the Receivership estate, which includes claims for off-sets related to matured policies already paid to the Receivership. All claims requesting damages from the Receivership estate or an off-set from monies due to the Receivership estate were therefore clearly and unambiguously barred by the general injunction.

The litigation exception was created in orders revolving around the question of whether the Receiver could sell policies which may have been fraudulently obtained. By definition, such sales could only involve non-matured policies. The above language was further issued in the context of denying Southwestern Life's motions to intervene in order to represent the insurer's interests with respect to such sales. An interpretation of the litigation exception as permitting suits only with respect to non-matured policies is the only logical interpretation available to the parties.

In argument to this Court, the Insurers attempt to expand the scope of the litigation permitted by the April 13, 2001 order by obfuscating the relationship between the April 13, 2001 language and the general injunctions already in place against any and all litigation. Because the general injunctions continued in existence, the only litigation permissible without leave of the Receivership court was litigation specifically so authorized. The Insurers attempt to cast the question as whether the April 13, 2001 order can be construed as specifically limiting litigation on policies to litigation on non-matured policies and then only against the Receiver. In light of the continuing general injunction, however, the proper inquiry is whether litigation on matured policies was ever specifically authorized, and we find that the clear and unambiguous answer to that question is no.

The question before this Court is whether the district court abused its discretion in finding that its orders "clearly" and "unambiguously" permitted suits only on non-matured policies. *Grace*, 72 F.3d at 1241. Against the backdrop of the general, universal injunctions against suits already in place, the posture of the parties when the litigation exception was issued and the language of the litigation exception itself combine to make it clear and unambiguous that the Court was granting the Insurers leave to defend against payment, or bring suit to declare demand for payment unenforceable, on the basis of fraud with respect to individual, non-matured insurance policies.

Numerous aspects of the April 13, 2001 order indicate that the district court was overruling its prior injunction only to the extent that the Insurers had a valid defense against payment on a fraudulently obtained policy. The order specifically referenced that the defense of fraud "may be asserted to avoid payment." Moreover, the court's order authorized litigation over disputes regarding the validity of *policies* and the Insurers' obligations to pay on those policies, not the right of the Receiver to retain funds already paid out and resting within the Receivership estate. The April 13, 2001 order further indicated that matured policies were noncontestable assets of the Receivership by stating that the Receiver could accept payment "on any mature policy, providing he has not received a prior notice of rescission or cancellation from any insurance company and that said policy has not been the subject of a prior order of any court of competent jurisdiction declaring such policy to be void due to fraud on the insurer."

> c.    *Due process concerns about the scope of the injunction are not properly before this Court*

Due process concerns about the scope of the injunction are not properly before this Court. The general injunctions issued in 1999 and 2001. The orders setting forth the litigation exception were issued in 2001 and 2004. Those orders are not on appeal before this Court. The Insurers argue that because they are now being found in contempt of those prior orders, this Court has the authority to review the scope of those orders insofar as they define acceptable grounds for findings the Insurers in contempt. Yet one of the Insurers, Southwestern Life, was party (as a prospective intervening plaintiff) to the proceedings in which the litigation exception was issued. Had Southwestern Life taken issue with the implications of the April 13, 2001 order for its legal rights, Southwestern could have moved this Court to intervene at that time. Moreover, the other two Insurers in the case at bar are owned by the same parent company as Southwestern Life. All three Insurers are owned by parent company Swiss Re, and all three Insurers shared counsel in the Delaware lawsuit.

In addition, the Insurers did not argue issues of due process to the court below, despite the fact that the Receiver argued in briefs to the district court that its prior orders were necessarily construed as permitting suit only on non-matured policies. This Court will not entertain arguments raised for the first time on appeal. *United States v. Hayes*, 218 F.3d 363, 366 (6th Cir. 1998). Due process concerns with respect to the Insurers rights under the disputed policies may also be raised with the Receivership court through a direct request to that court. The finding of contempt below was premised on the Insurers' violation of a general injunction against actions taken without leave of the district court overseeing the Receivership. Nothing precludes the Insurers from requesting leave of the district court to dispute the monies held on matured, but fraudulently obtained, policies and raising the attendant due process concerns in that request.

## D.    The District Court Did Not Abuse Its Discretion in Finding the Insurers in Contempt and in Limiting Future Suits Under the Litigation Exception to Ohio Forums

The Insurers' Delaware lawsuit both named Alpha Capital Group as a defendant and sought money damages from the assets of the Receivership estate. Such claims exceeded the scope of the litigation exception granted by the Receivership court. *See supra*. The Insurers do not argue that they were not on notice of the prior orders. They only argue that the district court's interpretation of its prior orders is unreasonable. As discussed above, the district court's interpretation of its own prior orders is both supported by the record and represents the only logical construction of those orders.

Because the Delaware lawsuit both named Alpha as a defendant and included claims for damages against the Receivership estate, the district court found that the suit exceeded that which the court had authorized. The district court further found that the inclusion of Alpha as a defendant was for the sole purpose of defeating diversity jurisdiction and therefore removal to federal court. (Alpha was organized under the state of Delaware.) The district court reasoned that because Alpha retained no assets or interests outside of the Receivership, no independent reason for Alpha's inclusion remained. Contrary to the Insurers' characterization, the district court did not find that its prior orders limited litigation to Ohio forums. Therefore, the choice of a Delaware forum was not a basis for the district court's finding of contempt. Rather, in fashioning the remedy for the Insurers' contempt, the district court ordered the Delaware suit dismissed, but granted the Insurers leave to "file suit against the Receiver in a federal or state court in Ohio to litigate their financial obligations regarding any non-matured policies within the Receivership estate . . . ." (J.A. at 269.) The district court has inherent authority to fashion the remedy for contumacious conduct. *See generally Chambers v. NASCO*, 501 U.S. 32, 45 (1991). The restriction on future suits by the Insurers under

the litigation exception to Ohio forums is well within the inherent powers of the district court sitting in equity. *See id.* (finding courts possessed inherent power to order dismissal of a suit for contumacious conduct).

Because the Delaware suit violated prior district court orders, and in light of the district court's factual conclusion that the inclusion of Alpha was solely for the improper purpose of defeating diversity, the district court did not abuse its discretion in finding the Insurers in contempt of its prior orders and in restricting future suits under the litigation exception to Ohio forums.

## III.

## CONCLUSION

For the foregoing reasons, we **AFFIRM** the district court's order.