NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 09a0489n.06

No. 08-3697

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
JUL 14, 2009
LEONARD GREEN, Clerk

SHELDON GORDON, *et al.*,

     Plaintiff-Appellant

v.

DAVID DADANTE, *et al.*,

     Defendant-Appellee

                                       /

ON APPEAL FROM THE UNITED
STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OHIO

BEFORE:     KEITH, CLAY, and GIBBONS, Circuit Judges.

     **CLAY, Circuit Judge**. The "Regalbuto Plaintiffs," a subset of the plaintiffs in the underlying action, appeal from the district court's order approving a settlement agreement between Ferris, Baker Watts, Inc. ("Ferris Baker") and the Receiver. The plaintiffs are former investors in IPOF Fund, a limited partnership which actually was a Ponzi scheme, using funds raised from subsequent investors to pay earlier investors. After discovering the fraudulent nature of IPOF Fund, in November 2005, the plaintiffs filed a complaint in district court against David A. Dadante and numerous brokerage firms, including Ferris Baker, alleging violations of the Securities Exchange Act ("SEA") of 1934, 15 U.S.C. § 78, the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962, 1964, and state securities laws. The Receiver subsequently entered into a settlement agreement with Ferris Baker and, in April 2008, the district court entered an order

1

approving the settlement agreement, from which the Regalbuto Plaintiffs now appeal. For the reasons set forth below, we **AFFIRM** the district court's order approving the settlement agreement.

## I.    BACKGROUND

Beginning in 1999, David A. Dadante solicited investments from individuals in exchange for a limited partnership interest in IPOF Fund.[1] Dadante told prospective investors that IPOF Fund would invest in initial public offerings, as well as stocks of companies included in the Dow Jones Industrial Average, and that their funds would be held in a money market account at Goldman Sachs Group, Inc. ("Goldman Sachs"). To further the scheme, Dadante provided existing investors with purported account statements showing their alleged returns. In reality, however, IPOF Fund was a Ponzi scheme, paying earlier investors their "returns" out of funds raised from subsequent investors.

Dadante used the funds he solicited from investors to purchase large quantities of stock in Innotrac Corporation ("Innotrac"). To make these purchases, Dadante opened accounts on behalf of IPOF Fund at numerous brokerage firms, including Ferris Baker. Dadante used the brokerage firm accounts to manipulate the price of Innotrac stock, causing IPOF Fund to purchase Innotrac stock at artificially inflated prices. In addition, Dadante borrowed heavily against IPOF Fund's Ferris Baker account. At the time the investors filed suit, IPOF Fund's account at Ferris Baker contained 2,999,152 shares of Innotrac stock and had a margin debt of almost nine million dollars.

On November 21, 2005, Sheldon Gordon filed a complaint in the United States District Court for the Northern District of Ohio against David Dadante; IPOF, L.P.; IPOF Fund; Ferris Baker; Wachovia Securities, LLC; H&R Block Financial Advisors, Inc.; GSGI; IPOF II, L.P.; Pershing,

---

[1]The term "IPOF Fund" refers to the collection of entities that Dadante used to perpetrate the Ponzi scheme, including IPOF II, L.P., IPOF, L.P., and GSGI.

2

LLC; and several "John Doe" companies and individuals. The four-count complaint claimed numerous violations of the SEA, RICO, Ohio securities laws, and also alleged common law fraud. Gordon's complaint requested that the court freeze the assets of Dadante and IPOF Fund, appoint a receiver to manage the assets of IPOF Fund, "disgorgement" of "all ill-gotten profits or proceeds," and $75,000 in damages. (ROA 90-91.)

On November 23, 2005, the district court established an equity receivership over IPOF Fund's assets. As requested in the complaint, the district court appointed Mark Dottore as Receiver to "collect, preserve, and protect any assets belonging to [IPOF Fund]" in order to "recover . . . assets transferred fraudulently or otherwise from [IPOF Fund]," as well as "to investigate the size of the loss and identify the victims" of Dadante's fraud. (ROA 526) (alterations and omission in original). Following the Receiver's appointment, in March 2006, Gordon filed an amended complaint, adding IPOF Fund and other investors, including the Regalbuto Plaintiffs,[2] as plaintiffs.

On January 22, 2008, the Receiver filed a motion with the district court seeking approval of a settlement agreement reached with Ferris Baker. The settlement agreement acknowledged that Ferris Baker disputed the Receiver's assertion that Ferris Baker would be liable for its actions "in connection with the alleged market manipulation of Innotrac stock and for other acts and conduct the Receiver alleges to be unlawful." (ROA 1026.) The parties also contested the validity of Ferris Baker's claim against IPOF Fund for payment of the margin debt associated with the account.

---

[2]The "Regalbuto Plaintiffs" are "seventy-eight plaintiffs that were friends and family of Frank Regalbuto," one of the principal investors in IPOF Fund. (Pls.' Br. 13.) Aside from the Regalbuto Plaintiffs, the plaintiff-investors included eight members of the Small family, the "Small Plaintiffs." The remaining plaintiffs were not represented by counsel and did not actively participate in the district court proceedings.

Acknowledging these disputes, the settlement agreement provided that Ferris Baker would pay $7.2 million to the Receivership estate in exchange for IPOF Fund's agreement to release Ferris Baker, its officers, directors, and employees from "claims that were or could have been raised . . . related to [the] trading [of Innotrac] stock" through IPOF Fund's account at Ferris Baker. (ROA 1030). Ferris Baker further agreed that, following approval of the settlement, the Receiver "shall own and have full authority in regard to the disposition of 2,999,152 shares of Innotrac common stock . . . free and clear of any margin debt, claim for margin debt, lien, charge, or encumbrance of any kind by [Ferris Baker] relating to [IPOF Fund's] account." (ROA 1026.)

The settlement agreement conditioned the execution of the settlement on the district court's approval, as well as the court's entry of the parties' agreed-upon Bar Order, Injunction and Dismissal of Claims ("Bar Order"), which was attached to the settlement agreement. Additionally, the settlement agreement required that IPOF Fund investors sign releases with respect to Ferris Baker's liability prior to receiving distributions from the proceeds of the settlement.

In support of the motion seeking approval of the settlement, the Receiver submitted a memorandum containing an extensive analysis of the fairness of the settlement agreement. The Receiver first provided a detailed history of Dadante's trading activity at Ferris Baker:

> Dadante actually deposited $5,779,704.66 of IPOF Fund cash . . . . At Ferris Baker[,] the IPOF Fund, controlled by Dadante, actually purchased only about 2.4 million of the 2.9 million plus shares currently held. Also, at various times Dadante made cash withdrawals from the Ferris Baker account that totaled several million dollars, which he deposited into IPOF Fund accounts and used to make distributions to individual IPOF Fund investors. The net of all deposits and withdrawals by Dadante at Ferris Baker is that approximately $7.7 million IPOF Fund assets were actually consumed in the account . . . .

(ROA 1004.) With respect to the Innotrac stock Ferris Baker would transfer to the Receivership estate, the Receiver acknowledged that "because of the size of the IPOF Fund share position in Innotrac stock at Ferris Baker, and because the stock is thinly traded, the Innotrac shares held at Ferris Baker could never be sold in any quantity on the open market" at a price near the approximately $3.28 per share trading price as of January 18, 2008. (ROA 1002.) However, the Receiver concluded that $3.00 per share represented the price at which the Receiver could sell the shares in a private block sale, and therefore valued the 2,999,152 shares of Innotrac at $8,997,456.

The Receiver also analyzed the potential claims he could bring against Ferris Baker on behalf of IPOF Fund investors, including an action under Section 10(b) of the SEA, 15 U.S.C § 78j(b), and Rule 10b-5, 17 C.F.R § 240.10b-5, based on Ferris Baker's alleged participation in market manipulation and its misrepresentations and omissions of material facts to IPOF Fund. In his analysis, the Receiver emphasized that, in such actions, a plaintiff is limited to actual damages and cannot recover punitive damages. The Receiver concluded that IPOF Fund's damages resulting from the manipulation of Innotrac stock price would constitute the "excess cost over actual value paid" by the investor. (ROA 1005.) Based on that formula, the Receiver found that IPOF Fund's actual damages amounted to approximately $7.6 million.[3] The Receiver stated that the $7.2 million

---

[3]The Receiver calculated this amount as follows:
> During the relevant period, IPOF Fund bought Innotrac stock in its account at Ferris Baker at various prices ranging from $2.60 per share to as high as $11.38, for an average (unweighted) purchase price of approximately $5.68 per share. Manipulative trading activity using IPOF Fund assets drove purchase prices to artificially high levels. The 2,479,152 shares that IPOF Fund actually purchased at Ferris Baker at the average price of $5.68 exceeded the initial $2.60 per share purchases by $3.08 per share, or in total a $7.6 million overpayment (assuming the lowest price reflected an actual value).

(ROA 1005.) The Receiver thus multiplied 2,479,152 by $5.68—the average price during the market manipulation period—to arrive at the price IPOF Fund paid based on the artificial prices. From that

payment that Ferris Baker agreed to make as part of the settlement "fairly compensate[d] IPOF Fund for the excess cost it incurred in buying Innotrac stock as part of Dadante's fraudulent scheme." (ROA 1005.) With respect to IPOF Fund's losses from possible misrepresentations and omissions by Ferris Baker, the Receiver determined that the total actual loss was $7.7 million—the amount of IPOF Fund assets that Dadante consumed while trading at Ferris Baker. The Receiver concluded that receiving the shares of Innotrac stock, which the Receiver valued at approximately $9 million, constituted a fair settlement for the IPOF Fund investors.

As part of his fairness assessment, the Receiver stated that he believed that IPOF Fund had strong claims against Ferris Baker and could prevail. However, the Receiver also noted that bringing these claims against Ferris Baker could result in "protracted litigation in which the outcome is uncertain." (ROA 1003.) According to the Receiver, "[a]ny . . . action . . . would be vigorously contested by Ferris Baker, and would include a counterclaim for margin debt in the IPOF Fund account." (*Id.*) Thus, the Receiver concluded that the settlement would eliminate the uncertainty and provide for a recovery of much of the loss the investors sustained as a result of Dadante's activities at Ferris Baker. Finally, the Receiver determined that the individual plaintiffs' claims against Ferris Baker lacked value for purposes of calculating Ferris Baker's potential liability because the individual plaintiffs lacked standing to assert claims against Ferris Baker, and could not prove the required reliance element to make out a claim under federal securities laws.

After the Receiver submitted the motion seeking approval of the settlement agreement, on January 24, 2008, the district court issued an order giving

---

amount, the Receiver subtracted what IPOF Fund *would have* paid had Dadante not engaged in market manipulation. To find that amount, the Receiver assumed that $2.60 was the true value, and multiplied $2.60 by 2,479,152.

all interested parties . . . the opportunity to comment, whether in support or opposition, on the proposed settlement between the IPOF Fund and Ferris Baker Watts, Inc. In the interest of fairly and efficiently addressing all the issues raised by the parties, the Court imposes the following procedures for commenting on the proposed settlement agreement:. . . .

Parties who wish to be heard . . . shall submit their position statements with respect to the proposed settlement agreement *in writing*, on or before Friday, February 22, 2008.

. . . .

On Wednesday, March 12, 2008, at 3:30 p.m., the Court will hold a hearing to provide the parties with a further opportunity to present their positions orally to the Court.

(ROA 1056-57.) The Regalbuto Plaintiffs subsequently filed timely objections to the proposed settlement agreement, raising three arguments: (1) the forgiveness of the margin debt associated with IPOF Fund's account conferred no benefit on the Receivership; (2) the almost three million shares of Innotrac stock that the Receivership would obtain had no real value; and (3) the cash payment by Ferris Baker was insufficient.

At the hearing, counsel for the Receiver and Ferris Baker commented regarding the terms of the settlement agreement, and answered the district court's questions about the parties' objections. Counsel for the Regalbuto Plaintiffs then reiterated the objections that he had submitted prior to the hearing. However, upon questioning from the court, counsel for the Regalbuto Plaintiffs admitted that the objections were unfounded and withdrew his objections. Nonetheless, shortly after the hearing, counsel filed a "supplemental memorandum" to "clarify an apparent misunderstanding that ha[d] arisen regarding the position of the Regalbuto [P]laintiffs." (ROA 1168.) Counsel stated that the "Regalbuto [P]laintiffs did not intend to convey that they withdrew their objections to the proposed settlement." (ROA 1169.)

7

On April 18, 2008, in an extensive order, the district court approved the settlement agreement reached between the Receiver and Ferris Baker. Consistent with the approval of the settlement, the court entered the Bar Order "dismissing any and all claims, counterclaims, crossclaims and third party complaints against [Ferris Baker] currently pending in the Receivership Action." (ROA 1221-24.) The Regalbuto Plaintiffs filed a timely notice of appeal.

## II. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN APPROVING THE SETTLEMENT AGREEMENT

### A. Standard of Review

This Court reviews a district court's decision to approve a settlement agreement in the context of an equity receivership for abuse of discretion. *See Liberte Capital Group, LLC v. Capwill*, 462 F.3d 543, 551 (6th Cir. 2006) (emphasizing that a district court administering an equity receivership has broad discretion); *Sterling v. Stewart*, 158 F.3d 1199, 1201 (11th Cir. 1998) ("Determining the fairness of the settlement [in an equity receivership] is left to the sound discretion of the trial court and we will not overturn the court's decision absent a clear showing of abuse of that discretion.").

### B. Analysis

The Regalbuto Plaintiffs challenge the district court's approval of the proposed settlement with Ferris Baker on several grounds. First, the Regalbuto Plaintiffs argue that they "were not afforded the opportunity to develop a proper record" with respect to the settlement agreement. (Pls.' Br. 14-15.) The Regalbuto Plaintiffs also contend that, because they were denied the opportunity for discovery and other information, the district court should have considered the nine specific factors set forth in *Girsh v. Jepson*, 521 F.2d 153 (3d Cir. 1975), in assessing the fairness and

adequacy of the settlement. Finally, the Regalbuto Plaintiffs challenge the value the district court assigned to certain provisions of the settlement agreement in evaluating the fairness of the settlement.[4]

### 1. Development of Record

The Regalbuto Plaintiffs' first argument essentially is that they should have been allowed to conduct discovery with respect to the settlement agreement—or the district court itself should have developed a record before approving the settlement—and that, in the absence of such development, the district court lacked sufficient information to evaluate the fairness and adequacy of the settlement.

"[A] district court has broad powers in fashioning relief in an equity receivership proceeding . . . ." *Liberte Capital Group, LLC*, 462 F.3d at 551(omission in original); *see SEC v. Basic Energy & Affiliated Res., Inc.*, 273 F.3d 657, 668 (6th Cir. 2001) (noting that a district court has "broad powers and wide discretion" in presiding over an equity receivership proceeding). In this case, to address the concerns of the various plaintiff groups, the district court determined that a "more open, participatory process" would be appropriate. Accordingly, rather than allowing the parties to conduct discovery, the district court permitted investors to file objections to the proposed settlement, and then conducted a hearing to address those objections.[5]

---

[4]Both the Receiver and Ferris Baker contend that, because the Regalbuto Plaintiffs failed to raise these concerns in the district court, they should be precluded from making such arguments to this Court. Regardless of whether the Regalbuto Plaintiffs have waived or forfeited the claims they raise on appeal, we find that their claims are without merit for the reasons discussed below.

[5]To the extent that the Regalbuto Plaintiffs argue that they should have received information about the Receiver's settlement negotiations with Ferris Baker, the district court found that it could not "get into too much detail about the back and forth of the negotiations because . . . there are confidentiality issues between client and counsel." (Tr. 19.) Further, "since the largest single asset

The record demonstrates that the district court had extensive knowledge of the claims involved in the case, the valuation of those claims, and the nature of the settlement. First, the Receiver's memorandum submitted to the court in support of the motion seeking approval of the settlement set forth in detail the Receiver's calculations and valuation of the settlement. At the hearing, the district court questioned counsel for the Receiver regarding these calculations, and also asked counsel to respond to the objections raised by the various plaintiff groups:

Mr. Rapp:     Now, in the settlement, IPOF Fund would also receive $7.2 million in cash. The important thing about that cash amount is that it represents almost 100% of the actual damages that IPOF Fund suffered at Ferris, Baker in purchasing the Innotrac stock. This, Your Honor, represents actual compensation for what actually happened. . . . And keep in mind as well that the amount of the cash payment in this settlement is more money than IPOF Fund actually deposited into the Ferris, Baker account.

The Court:     Well, let me ask you to explain that in a little more detail, Mr. Rapp, because the - - as the Receiver has continually pointed out, there's a loss in excess of $25 million that the Receiver calculates as the losses that have been sustained by the investors and the Fund. That's after deducting for payments to investors and the Fund. So where does the 7.2 million factor into the 25 million?

(Transcript of March 12 Hearing ("Tr.") 8-9.) After counsel for the Receiver responded, the district court then questioned whether the nearly three million shares of Innotrac stock that the Receivership estate would obtain as a result of the settlement could, in fact, be sold:

of the estate is publicly-traded [sic] stock, both the IPOF Fund and the Receiver are required by law to refrain from public disclosures of any discussions which could affect the value of those shares." *Gordon, et al. v. Dadante, et al.*, No. 1:05CV2726, 2008 WL 222507, at *4 n.4 (N.D. Ohio Jan. 25, 2008). With respect to other aspects of the settlement, the district court already had determined that the Regalbuto Plaintiffs could not depose Dadante regarding his trading activity at Ferris Baker because such discovery "is the province of the Receiver" rather than the individual plaintiffs. *Id.* at *8.

The Court:  You referenced the - - the fact that the settlement includes the ability to retain the shares free and clear of any margin debt. . . . You want to address that issue?

Mr. Rapp:   Yeah, I'm very happy to, to address that today, Your Honor. And there's no question that there has been some uncertainty . . . about what the stock component of the Ferris, Baker proposed settlement means.

The first thing . . . is that 3 million shares of Innotrac stock that would be received free and clear of margin debt, [but] could not simply be sold in the public trading market. The attempt to sell any large amount of the stock that way would drive the price to a tiny fraction of what it trades at in the market today.

The Court:  Right. I think that's what's driving the conclusion that maybe it's valueless to give them the shares.

Mr. Rapp:   Right. . . . . [B]ut the second thing that's involved here that has to be clear is that the Innotrac stock owned by IPOF Fund, while it cannot be sold off in the public marketplace for anything approaching its fair value, does not mean that it cannot be sold. . . . [T]he IPOF Fund owns 34% of the outstanding stock of this company and its shareholder equity. . . . . There's no question that the Receiver places real cash value on the 3 million shares of Innotrac stock . . . . because Innotrac stock can be sold as an entire block and at a price that represents fair value.

. . . .

[T]he CEO of Innotrac, Mr. Dorfman, pledged the same effort and commitment to seek a fair disposition of the IPOF Fund shares. With the Receiver, he has acted on that pledge, and he has engaged in meaningful negotiations with the Receiver aimed at a block sale of the Innotrac stock held by IPOF Fund at a price not less than $3 per share.

[T]he Receiver believes and has every reason to believe that in a private block transaction, the value of Innotrac stock held by the Fund is not less than $3 per share.

(Tr. 10-14.) In explaining the basis for his conclusion that the shares would have value for the

Receivership estate, the Receiver emphasized that the settlement with Ferris Baker was the first step

11

in the overall effort to recover the investors' funds, and informed the court that negotiations were underway with the other brokerage firms at which Dadante had IPOF Fund accounts.[6]

The district judge also thoroughly questioned counsel for Ferris Baker. At the hearing, the court asked counsel to respond to certain investors' objection that, based on the potential liability of both the company and its officers and directors, the settlement amount was too low. (Tr. 16-17.) Counsel pointed out that the loss caused through trading at Ferris Baker "is what it is, irrespective of who may be called upon to pay it," and thus "there's just one total pot" from which the investors could recover. (Tr. 17.) In addition, the court questioned Ferris Baker's counsel regarding a proposal by the investors that Ferris Baker purchase the Innotrac stock at $3 per share, and distribute the proceeds to the Receivership estate. Counsel responded that "[t]he Receiver wants the stock," because the estate would "thereby retain the right to realize any upside potential that there may be." (Tr. 18.) Ferris Baker acknowledged that, at one point, it had proposed a provision that would entitle it to any proceeds of the stock that exceeded the approximately $9 million in margin debt. However, according to Ferris Baker, the Receiver "absolutely refused" to include such a provision. Accordingly, "to the extent that the Receiver is able to recover more than the $9.4 million value, Ferris[]Baker receives no benefit from that; that flows directly to the IPOF Fund and its investors[.]" (Tr. 19.)

---

[6]While this appeal has been pending, the district court approved a settlement with similar terms between the Receiver and McDonald Investment Corp., another brokerage firm holding IPOF Fund Innotrac stock. *See Gordon, et al. v. Dadante, et al.*, No. 1:05CV2726, 2008 WL 4625157 (N.D. Ohio Oct. 16, 2008). The Regalbuto Plaintiffs appealed the approval of the McDonald settlement approval to this Court, raising substantially the same issues as in this appeal. This Court recently dismissed that appeal for failure to timely file a notice of appeal. *Gordon, et al. v. Dadante, et al.*, No. 09-3322 (6th Cir. June 15, 2009).

Thus, the record demonstrates that, despite the Regalbuto Plaintiffs' argument that the district court lacked sufficient information to evaluate the fairness of the settlement, the district court used the hearing as an opportunity to obtain as much information as possible regarding the settlement and its terms. Moreover, as the district court's opinion approving the settlement agreement evinces, the court engaged in an independent analysis of the settlement—it did not, as the Regalbuto Plaintiffs argue, merely adopt the Receiver's assessment. In its opinion, the court relied on facts uncovered during the government's criminal investigation. The court also compared the percentage of loss that the IPOF Fund investors would recover through the Ferris Baker settlement to settlements in other securities fraud cases, noting that courts had approved settlements where the recovery rates were approximately 35% of total damages or less. In the absence of any evidence that the actual damages would exceed the amount estimated by the Receiver, the district court concluded that the settlement provided IPOF Fund investors with "nearly a 100%" recovery. (ROA 1214.)

Further illustrating the thoroughness of the district court's assessment of the settlement is its evaluation of the impact of the Receiver's fees on the ultimate amount of recovery. The district court acknowledged that the Receiver's fees would reduce the ultimate distribution to investors, but that the fees would be no greater than if the Receiver had initiated litigation against Ferris Baker, or if the Receiver had a contingency agreement with IPOF Fund.

The record shows that the district court was well informed regarding the nature of the settlement, the history of the case, the parties' objections, and the potential theories of recovery. The Regalbuto Plaintiffs have failed to identify specific information that the district court should have examined, and do not present any contrary evidence regarding their view of the stock value or other aspects of the settlement. Aside from conclusory statements, the Regalbuto Plaintiffs do not identify

13

specific defects in what was, based on the record, an exceptionally careful settlement approval process.[7]  We therefore conclude that the Regalbuto Plaintiffs were not denied the opportunity to meaningfully participate or object, and that the district court had more than sufficient information to assess the fairness of the settlement proposed by the Receiver.  *Cf. Sterling*, 158 F.3d at 1204 (concluding that the district court did not abuse its discretion in approving the settlement where the district court "carefully reviewed [the Receiver]'s analysis of the underlying facts, the defendants' defenses, and the appellants' presentations at the fairness hearing").[8]

### 2.     *Girsh* Factors

The Regalbuto Plaintiffs next argue that, in evaluating the fairness of the settlement, the district court erred by failing to consider the nine specific factors set forth in *Girsh v. Jepson*, 521 F.2d 153 (3d Cir. 1975).   The district court, in a footnote of its opinion, noted that while it was under no obligation to follow any particular procedure in approving the proposed settlement, the class action context provided a useful guide.  As an example of "factors to aid a court in considering

---

[7]Even when pressed by the panel at oral argument to identify a specific deficiency in the district court's proceeding, the Regalbuto Plaintiffs were unable to point to anything in the record that would suggest any irregularity in the settlement approval.

[8]Throughout their brief, the Regalbuto Plaintiffs also contend that the district court permitted them to participate, "but only to raise their objections in summary fashion.  They were not allowed to underscore their concerns and were asked for objection."  This argument misconstrues the events that took place during the hearing.  The district court questioned counsel for the Regalbuto Plaintiffs regarding the objections.  Following this discussion, counsel admitted that the objections were based on a misreading of the settlement agreement.  In addition, after counsel explained the basis for the misunderstanding—that the Regalbuto Plaintiffs thought the Receiver would distribute the shares immediately—the district court noted that counsel had "sort of changed the whole - - I had several questions, but now that I understand where you were coming from," the questions no longer were relevant.  (Tr. 37.)  Further, counsel did not press the district court for additional time to make objections, or respond to any of the Receiver's detailed explanations of the basis for the settlement.  Accordingly, any allegation that the district court provided only "summary" process is entirely without support in the record.

14

the fairness of a proposed settlement," the district court noted the nine factors set forth by the Third Circuit in *Girsh*. (ROA 1213 n.12.) Despite the fact that *Girsh* addressed a class action settlement, the Regalbuto Plaintiffs contend that the district court's failure to explicitly consider each of the nine factors constitutes an abuse of discretion. However, even *Girsh*, a class action case, did not obligate courts to explicitly evaluate all nine factors, but found only that such factors "are relevant" to determining the fairness of a settlement. *Girsh*, 521 F.2d at 156.

More importantly, a district court's obligation in approving a settlement in the context of an equity receivership is fundamentally different from its role in overseeing a class action settlement. In a class action proceeding, Rule 23 of the Federal Rules of Civil Procedure obligates a district court to determine that a settlement is "fair, reasonable, and adequate," an inquiry that involves consideration of numerous factors. *E.g.*, *Intl' Union, United Auto., Aerospace, & Agric. Implement Workers v. Gen. Motors Corp.*, 497 F.3d 615, 631-32 (6th Cir. 2007) (setting forth seven factors for courts to consider in evaluating the fairness of a class action settlement). In contrast, no federal rules prescribe a particular standard for approving settlements in the context of an equity receivership; instead, a district court has wide discretion to determine what relief is appropriate. *See Liberte Capital Group, LLC*, 462 F.3d at 551. Accordingly, the Regalbuto Plaintiffs' argument that the district court erred in not explicitly following *Girsh* is without merit.

### 3. Settlement Value

Finally, the Regalbuto Plaintiffs challenge the specific calculations the Receiver and district court employed to evaluate the settlement. The Regalbuto Plaintiffs allege that the excess amount that IPOF Fund paid for Innotrac stock as a result of Dadante's market manipulation is $9.3 million, rather than the $7.6 million calculated by the Receiver. However, without any indication from the

record that the Receiver undervalued damages due to market manipulation, there is no basis for overturning the district court's determination that $7.6 million was a fair approximation of IPOF Fund's damages.

The Regalbuto Plaintiffs also contend that the Innotrac stock transferred to the Receivership estate as part of the settlement cannot be sold and therefore lacks value. According to the Regalbuto Plaintiffs, any valuation of the stock that exceeds zero is flawed. As discussed above, the Regalbuto Plaintiffs explicitly withdrew this basis for objecting to the settlement agreement during the hearing, and therefore have waived their right to reassert this argument on appeal. *See United States v. Denkins*, 367 F.3d 537, 543-44 (6th Cir. 2004) (concluding that the defendant, having expressly raised the issue and then abandoned it by withdrawing his objection, "waive[d] any right of appeal on that issue").

The Regalbuto Plaintiffs next argue that the district court failed to account for potential recovery under state and common law remedies, which they argue could "give rise to punitive damages." (Pls.' Br. 27.) Despite their assertions, the Regalbuto Plaintiffs provide no analysis of the claims on which they allege they could recover punitive damages. The Regalbuto Plaintiffs instead argue that, because Ferris Baker could be held jointly and severally liable for the losses that Dadante caused through his trading at *other* firms, the recovery obtained in the settlement with Ferris Baker is too low.

However, the theory of "joint and several liability" articulated by the Regalbuto Plaintiffs does not provide a basis for holding Ferris Baker liable for the losses IPOF Fund incurred at the other brokerage firms. The Regalbuto Plaintiffs argue that IPOF Fund could show that Ferris Baker "knowingly committed a violation of securities law," and that 15 U.S.C. § 78(t) "creates an agency

16

like relationship sufficient to impute fraud to supervisors and accordingly joint and several liability." (Pls.' Br. 28.) This argument confuses joint and several liability with the principle of respondeat superior.[9] While the Regalbuto Plaintiffs might be correct that Ferris Baker may be held vicariously responsible for the actions of their brokers under federal securities law, that does not mean that Ferris Baker is jointly and severally liable for the losses that IPOF Fund sustained at *all* of the brokerage firms at which Dadante maintained an account.

Finally, the Regalbuto Plaintiffs dispute the conclusion that their individual claims against Ferris Baker are untenable. In an effort to recover lost funds, individual investors, including the Regalbuto Plaintiffs, "attempted to assert [Securities] Exchange Act § 10(b) and Rule 10b-5 claims directly against Ferris Baker" (ROA 1009), claims which were dismissed pursuant to the Bar Order entered in conjunction with the order approving the settlement agreement. The Receiver concluded that such claims did not have significant value—and therefore did not alter his analysis of the fairness of the settlement amount—because the individual investors were unlikely to succeed in holding Ferris Baker responsible for their individual losses.

"The basic elements of a federal securities fraud action pursuant to Rule 10b-5 and Section 10(b) . . . are: (1) a material misrepresentation or omission; (2) *scienter*; (3) a connection with the purchase or sale of a security; (4) reliance (or transaction causation); (5) economic loss; and (6) loss causation." *Brown v. Earthboard Sports USA, Inc.*, 481 F.3d 901, 917 (6th Cir. 2007). This Court has noted that "[t]o state a cause of action under § 10(b) and Rule 10b-5 a plaintiff must plead that

---

[9]Even if this argument were interpreted as arguing that Ferris Baker is liable for the actions of its employees, the settlement takes Ferris Baker's vicarious liability into account. For example, during the hearing, counsel for Ferris Baker acknowledged that, regardless of whether it or its brokers—or both—were found liable for the fraud, all of the recovery would come from the same "pot," i.e., Ferris Baker.

17

the defendant made a false statement or omitted to state a material fact . . . , and that the plaintiff's reasonable reliance on the statement or omission proximately caused the plaintiff's injury." *In re Sofamore Danek Group, Inc.*, 123 F.3d 394, 400 (6th Cir. 1997). Here, the individual plaintiffs' injuries were caused not by any misrepresentation or omission on the part of Ferris Baker but by Dadante's false statements and representations. Thus, nothing Ferris Baker omitted or misrepresented "significantly altered the total mix of information made available" to the individual investors. *Id.*; *see Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*,552 U.S. 148, 128 S. Ct. 761, 766 (2008) (concluding that the implied right of action under § 10(b) could not be used by investors to hold certain entities liable "because the investors did not rely upon [the entities'] statements or representations").

The Regalbuto Plaintiffs argue, however, that they can show reliance because "reliance . . . may be presumed when fraudulent misrepresentations are made." To support their argument, the Regalbuto Plaintiffs cite to *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154 (3d Cir. 2001). However, in *Newton*, the misrepresentations were made by a securities dealer to an investor. *Id.* at 169-70. In contrast, the individual investors, including the Regalbuto Plaintiffs, never consulted with Ferris Baker regarding their investment in IPOF Fund. In fact, they believed that their investments were held in a Goldman Sachs account, as alleged in the complaint.

The Regalbuto Plaintiffs have failed to demonstrate that the district court abused its discretion in approving the settlement between the Receiver and Ferris Baker. A district court has wide discretion to administer proceedings in an equity receivership—including the approval of settlements. Given the inclusive and extensive procedures used by the district court to evaluate the

18

fairness of the settlement, we conclude that the district court did not abuse its discretion in approving the settlement agreement between the Receiver and Ferris Baker.

## III.    CONCLUSION

We therefore **AFFIRM** the district court's order entering the Bar Order and approving the settlement between Ferris Baker and the Receiver.